Charles A. **KUBAJAK, Jr.,** Appellant

v.

**LEXINGTON–FAYETTE URBAN COUNTY GOVERNMENT; Hon. Roger D. Riggs, Administrative Law Judge; and Workers' Compensation Board, Appellees.**

No. 2003–SC–0974–WC.

Supreme Court of Kentucky.

Dec. 22, 2005.

David B. Allen, Lexington, Counsel for Appellant.

Sherri P. Brown, Ferreri & Fogle, Robert L. Swisher, Geralds, Jones, Sherrow, Schrader & Rice, Lexington, Counsel for Appellee.

## OPINION OF THE COURT

It is undisputed that the claimant suffers from post-traumatic stress disorder, that the condition is disabling, and that it is work-related. An Administrative Law Judge (ALJ) determined, however, that the condition was due to observing gruesome crime scenes. Therefore, it was not an "injury" as defined by KRS 342.0011(1) and was not compensable. *See Lexington–Fayette Urban County Government v. West,* 52 S.W.3d 564 (Ky.2001). Having determined that the evidence did not compel a finding that the condition resulted from a physically traumatic event, the Workers' Compensation Board (Board) and the Court of Appeals have affirmed. Likewise, we affirm.

The claimant began working as a police officer for the Lexington–Fayette Urban County Government in October, 1986. His claim alleged that as of January 19, 2001, he suffered from post-traumatic stress disorder, panic attacks, and other psychological or psychiatric conditions and that he had sustained a cumulative trauma psychiatric injury resulting from the "highly stressful duties required by the job."

After completing the police academy, he began working on patrol. His duties included responding to accidents, taking bur-

glary reports, and attempting to deter crime. He stated that he was involved in a number of fights over the years. The worst occurred early in his career, when he stopped a vehicle in which four individuals were riding. After the driver exited the vehicle, he became hostile, and a fight resulted. The claimant had to draw his weapon and then wait for back-up to arrive and assist him. He stated that he missed no work and required no medical treatment due to the incident.

On May 28, 1990, the claimant transferred to the Crime Scene Investigation Unit, where he was responsible for collecting, documenting, and preserving evidence to be introduced in court. More specifically, he photographed crime scenes, recovered latent fingerprints, collected evidence, and appeared in court. The work involved a daily exposure to the details of scenes of extreme and graphic violence.

In the early to mid–1990s, the claimant began to experience headaches and stomach discomfort. His symptoms worsened appreciably after working the scene where two fellow officers were shot. On occasions, he experienced chest pains severe enough that he went to the hospital, thinking he was having a heart attack. The unit was short-staffed, and officers were subject to be called out at any time. Thus, he attributed his symptoms to "burn out" from the long hours and irregular sleep patterns that resulted. Sometime in the early 1990s, Dr. Bailey discussed the possibility that the origin of the symptoms might be psychological, but the claimant requested that nothing be put in his records that would jeopardize his employment.

At some point, the claimant began to have nightmares and thoughts he called "hauntings," in which he relived some of the crime scenes he had worked. He also realized that he had over-reacted to cer-

tain situations, explaining that he had feared for his life and drawn his weapon when an elderly woman whose vehicle was stopped began to reach under the seat. Convinced that he needed a job with regular eight-to-five hours, he requested a transfer. On August 5, 1996, he was transferred to the Auto Theft Unit. Yet, the flashbacks and nightmares became more intense and much more frequent, and he began to withdraw from contact with other people.

The claimant was transferred to the Robbery Unit in July, 2000. This involved everything from purse snatchings to bank robberies and occasional exposures to violent crime scenes. He testified that he informed superiors at the time that he was experiencing stress but was not specific about the cause or symptoms. In October, 2000, he was called to the scene of a robbery where a body was found. As he approached the home and saw the medical team, he went into a panic and broke down. Shortly thereafter, he told the Chief that his job was too stressful and was endangering his health.

On October 30, 2000, the claimant transferred to Community Service, a light-duty assignment. He explained that thirty days of light duty were required before requesting disability retirement. During this period, he contemplated suicide and recognized that he needed professional help. He sought treatment with Dr. Allen, who diagnosed post-traumatic stress disorder and informed him of the diagnosis on December 11, 2000.

The claimant was placed on medical leave on January 19, 2001, and testified that he has not worked since then. He applied for disability retirement shortly thereafter. It was approved following evaluations by Drs. Ruth and Ludwig, both of whom provided evidence in his workers' compensation claim.

The claimant testified initially that he suffered no "physical" injuries as a police officer. He testified later that he sustained a whiplash injury in a vehicular accident and had been involved in physical scuffles on at least two occasions. He stated that he sustained "bruises and abrasions" in the incidents but sought no medical treatment. His argument to the ALJ was that the physically traumatic events contributed to causing his psychiatric condition; therefore, it directly resulted from a physical injury and was compensable under *West, supra*.[1]

Dr. Ludwig, a psychiatrist, diagnosed major depressive disorder and post-traumatic stress disorder. He attributed the conditions entirely to the claimant's exposure to scenes of violence and death in his work. In his opinion, they were permanently and totally disabling with regard to the claimant's ability to work as a police officer.

Dr. Ruth, a psychiatrist, examined the claimant and concluded that he could not return to work as a police officer. In his opinion, the claimant's post-traumatic stress disorder was caused by repeated exposure to signs of violence while investigating crime scenes. He assigned a 15% AMA impairment under the last edition that provided percentage ratings.

Dr. Allen, the treating clinical psychologist, took a history consistent with that to which the claimant testified. He diagnosed post-traumatic stress disorder due to the cumulative stress of the claimant's work. He thought that, with treatment, the claimant would be able to perform work other than as a police officer.

In a supplemental report, dated May 14, 2002, Dr. Allen stated that the claimant reported several occasions in which he was injured while in the line of duty and that some of those altercations appeared consistently in his nightmares. One particular event was an incident in which he found it necessary to pull his gun on a knife-wielding assailant following a scuffle in which he was injured. In Dr. Allen's opinion, repeated physical harm or threat of physical harm had increased the claimant's general level of arousal and anxiety. Other events included an exposure to blood at various crime scenes followed by information that the blood was positive for HIV or Hepatitis C. He concluded, therefore, that the physical nature of the claimant's work and "consequent or potential injuries" were "an important part of the core experiences which led to his Posttraumatic Stress Disorder."

When deposed by the employer, Dr. Allen testified that he had not seen the claimant since May 9, 2001, when the claimant stopped by his office, talked with him briefly about scuffles and altercations as well as exposure to blood products, and asked him to clarify that they had discussed such events. Dr. Allen stated that he agreed to do so because they had discussed the events, and they "were part of the larger pattern of posttraumatic stress that he had been experiencing and had consistently experienced." Therefore, he viewed the supplemental report as being a clarification of his diagnosis and the reason for the diagnosis.

Dr. Allen testified that he had recorded no physically traumatic event involving the

---

1. At oral argument, the claimant referred to testimony by Dr. Granacher regarding changes that occur in the brains of individuals with post-traumatic stress disorder. Relying on *McCowan v. Matsushita Appliance Co.*, 95 S.W.3d 30 (Ky.2002), he argued that those changes would be compensable as physical changes that resulted from emotional trauma; however, the argument was not preserved for our review because he failed to raise it to the ALJ.

claimant and was not aware that any of the scuffles or altercations the claimant mentioned required medical treatment. He was questioned about whether any physical events in which the claimant was involved had evoked the intense fear, helplessness, or horror that the DSM IV required for a diagnosis of post-traumatic stress disorder. He stated that during physical altercations, such as being confronted by a knife-wielding husband during a domestic disturbance, the thought that one might be injured significantly is going to occur and did occur to the claimant. However, such events happened "within the context of a much larger picture of very traumatic, horrific events and situations that he has dealt with." Dr. Allen characterized an attempt to attribute the claimant's condition to any particular event as splitting hairs.

When questioned further about any physical injuries the claimant may have reported, Dr. Allen noted that it was not his experience for an individual to report a medical problem such as a cut that required stitches as being a significant injury unless it required ongoing medical treatment. According to his records and recollection, the claimant never reported that he suffered any physical harm although he did mention scuffles, altercations, and exposures to situations that he perceived as being potentially life-threatening. Dr. Allen explained that two classes of situations were involved, situations in which the claimant perceived the potential of personal harm and those in which he witnessed extraordinarily horrific crime scenes. He attributed the claimant's condition to the cumulative effects of all of his experiences as a police officer, particularly to the crime scene investigations. He viewed the claimant's investigation of the 1996 shooting of two fellow officers as being significant in precipitating his symptoms. Acknowledging that

the claimant did not initially relate his symptoms to his exposure to emotionally stressful situations, Dr. Allen explained that defensive avoidance, or failing to make a clear connection between symptoms and their cause, is fairly typical of people with post-traumatic stress disorder.

Dr. Granacher examined the claimant and performed psychological testing. He reported that the claimant sustained a 20% whole-body psychiatric impairment due to post-traumatic stress disorder. He attributed the condition to the cumulative emotional stress of the claimant's work, noting that the condition is common in police and fire personnel. He thought that the claimant could be productive and successful in a different type of work.

When deposed by the employer, Dr. Granacher was asked whether the claimant reported "a physical event that was life-threatening or to which he reacted in horror or with an intense fear or a feeling of helplessness or hopelessness." He testified that the claimant never reported a specific physical event but did repeatedly state that he found working a crime scene to be stressful. Furthermore, the social history obtained from the claimant included a number of questions such as whether he had ever been violent; had ever been harmed by another; had ever been shot at, stabbed, or beaten by another; or had ever threatened to kill another. The claimant answered all in the negative. Later, Dr. Granacher stated that if a physical event had contributed to the claimant's condition, he would have expected him to report it. In Dr. Granacher's opinion, the post-traumatic stress disorder was due to psychological events, particularly having to work the scenes where two fellow officers were shot. It was in no way a direct result of a physical injury.

After summarizing the evidence, the ALJ noted that the case turned on whether the claimant's psychological, psychiatric, or stress-related condition was a direct result of a physical injury. KRS 342.0011(1). Yet, only Dr. Allen's testimony even remotely related the condition to a physically traumatic event. Relying instead on testimony from Drs. Ruth, Ludwig, and Granacher, the ALJ determined that the claimant's post-traumatic stress disorder and resulting impairment were not a direct result of a physical injury and, therefore, were not compensable as an injury.

For the purposes of Chapter 342, the word "injury" is a term of art. Before December 12, 1996, KRS 342.0011(1) defined an "injury" as being a harmful change in the human organism. Since December 12, 1996, KRS 342.0011(1) has defined an "injury" as being a work-related traumatic event or series of such events that causes a harmful change in the human organism. The statute requires that a psychological, psychiatric, or stress-related change in the human organism must be "a direct result of a physical injury."

■ Noting that KRS 342.0011(1) now defines an "injury" as being a traumatic event or series of events rather than as being a harmful change, the court determined in *West, supra,* that a psychological, psychiatric, or stress-related change in the human organism must directly result from a physically traumatic event or series of events in order to be viewed as being an injury. However, it was unnecessary for every traumatic event in a series causing psychological or psychiatric harm to involve physical rather than emotional trauma. *Id.* at 567. Addressing the facts that were present and to be considered on remand, the court stated that if the first in a series of traumatic events involves physical trauma and if the event is a direct and proximate cause of the worker's psychological harm, the worker has sustained an "injury" under KRS 342.0011(1). *Id.*

■ The claimant bore the burden of proving every element of his claim, including the fact that he sustained an "injury" as defined by KRS 342.0011(1). *Roark v. Alva Coal Corp.,* 371 S.W.2d 856 (Ky.1963). KRS 342.285 provides that an ALJ's decision is "conclusive and binding as to all questions of fact." As the finder of fact, it is the function of the ALJ to determine the credibility of witnesses, to draw reasonable inferences from the evidence, and to weigh conflicting evidence. *Paramount Foods, Inc. v. Burkhardt,* 695 S.W.2d 418 (Ky. 1985); *Caudill v. Maloney's Discount Stores,* 560 S.W.2d 15, 16 (Ky.1977). Having failed to convince the ALJ that his post-traumatic stress disorder is a direct result of a physical injury, the claimant's burden on appeal is to show that the evidence in his favor was so overwhelming that the finding to the contrary was unreasonable. *Special Fund v. Francis,* 708 S.W.2d 641, 643 (Ky.1986).

■ In *West, supra,* there was evidence that the origin of the psychiatric harm was a physical encounter with a suspect. In the present case, however, the ALJ chose to rely on the medical evidence indicating that the cause of the claimant's psychiatric harm was an after-the-fact exposure to scenes of physical trauma to others and that any physically traumatic events were insignificant. As explained in *West, supra,* KRS 342.0011(1) requires a psychiatric harm to be a direct result of a physically traumatic event. Nothing in the statute implies a legislative intent that the physical trauma causing a harmful change be to someone other than the claimant. Therefore, we are not convinced that physical trauma to another constitutes a physically traumatic event to the claimant for the purposes of KRS 342.0011(1).

Contrary to the claimant's assertion, the evidence did not compel a finding that his psychiatric condition was a direct result of a physically traumatic event or series of events. He reported no serious physical trauma to any medical expert. Only Dr. Allen testified that scuffles and physical altercations led the claimant to perceive a potential threat to his life and contributed to causing his condition. He prepared the supplemental report addressing those events at the claimant's request, one year after their last visit. All of the other experts viewed the claimant's exposure to crime scenes as being the cause of his condition. We acknowledge that the result is harsh in this case, but it was the ALJ's prerogative to rely on the other experts.

The decision of the Court of Appeals is affirmed.

COOPER, JOHNSTONE, ROACH, and WINTERSHEIMER, JJ., concur.

SCOTT, J., dissents by separate opinion in which LAMBERT, C.J., and GRAVES, J., join.

SCOTT, Justice, dissenting.

It is undisputed that claimant suffers from post-traumatic stress disorder, that the condition is disabling, and that it is work-related. All three psychiatrists (Granacher, Ludwig and Ruth) as well as the psychologist, Allen, were in agreement on all points.

Moreover, the Administrative Law Judge (ALJ) determined that the condition was due to working gruesome crime scenes. In his opinion, however, it was not an "injury" as defined by KRS 342.0011(1) and therefore not compensable. *See Lexington–Fayette Urban County Government v. West*, 52 S.W.3d 564 (Ky.2001).

Having determined the evidence did not compel a finding that the condition resulted from a "physically traumatic event," as explained in *West*, the Workers' Compensation Board (Board), the Court of Appeals and this Court, have affirmed. For reasons set out, I respectfully dissent.

Claimant began working as a police officer for the Lexington–Fayette Urban County Government in October, 1986. His claim alleged that as of January 19, 2001, he suffered from post-traumatic stress disorder, panic attacks, and other psychological or psychiatric conditions that were attributable to a gradual, or cumulative, injury resulting from the violent nature of his job.

After completing the police academy, he began working on patrol. His duties included responding to accidents, taking burglary reports, and attempting to deter crime. He stated that he was involved in a number of fights over the years. On two occasions while he was a patrolman, he experienced life-threatening events, and these occasions included physical **fights** involving the claimant and the suspects being arrested. One occasion involved a domestic disturbance where the husband was physically beating his wife and when claimant tried to stop him, the angry husband pulled a knife on claimant and threatened to kill him. Claimant persuaded the suspect to put his knife away but they then fought physically and the suspect slammed claimant up against a wall. Claimant suffered scratches, bruises and soreness. On another occasion, claimant made a night traffic stop and asked the driver to produce his license and registration. The driver reached down under the seat and claimant thought he might be reaching for a weapon. Claimant drew his weapon and ordered him out of the car, but as he came out, he grabbed the barrel of claimant's weapon. Claimant ordered him to let go and he did. Claimant put his gun in his holster but then the two fought and rolled

around on the street. Later several other occupants of the car started getting out to assist the driver. Claimant drew his weapon again and threatened to shoot them if they did not get back in the car. A back-up officer soon arrived and helped claimant regain control. Again, claimant suffered minor injuries, including scratches and bruises.

On May 28, 1990, the claimant transferred to the Crime Scene Investigation Unit (CSI), where he was responsible for attending crime scenes, collecting, documenting, and preserving evidence therefrom. The work involved daily exposure to the details of extreme and graphic violence. As acknowledged by the Board, the claimant, "on almost a daily basis, would be called upon to observe scenes of incredible violence."

In the early to mid–1990s, the claimant began to experience headaches and stomach discomfort. His symptoms worsened appreciably after working a scene where two of his fellow officers were shot. On occasion, he experienced chest pains severe enough that he went to the hospital, thinking he was having a heart attack. At the time, he attributed his symptoms to "burn out" from the long hours and irregular sleep patterns that resulted. Once while seeing Dr. Bailey, the doctor discussed the possibility that the origin of the symptoms might be psychological, but claimant asked that nothing be put in his records that would jeopardize his employment.

At some point, he began to have nightmares and thoughts he called "hauntings," (flashbacks) in which he relived some of the life-threatening arrests he'd been involved in, as well as the crime scenes he'd worked. He also realized that he had over-reacted to certain situations, explaining how . . . on one traffic stop, he'd drawn his pistol on an elderly lady when she began to reach under her seat—he was so afraid. Convinced he needed a job with regular hours, he requested another transfer. On August 5, 1996, he was transferred to the Auto Theft Unit. Yet, the flashbacks and nightmares became more intense and more frequent. He began to withdraw from contact with other people.

In July, 2000 he was transferred to the Robbery Unit. This involved everything from purse snatchings to bank robberies, but still exposure to violent crime scenes. He informed his superiors at the time that he was experiencing stress but was not specific about the cause or symptoms. Then, in October, 2000, he responded to the scene of a robbery where a body was found. As he approached the home—he saw the medical team—he went into a panic and broke down. Shortly thereafter, he told the Chief that his job was too stressful and was endangering his health.

On October 30, 2000, claimant transferred to Community Service, a light-duty assignment. He explained that thirty days of light duty were required before requesting disability retirement. During this period, he contemplated suicide and recognized that he needed professional help. He sought treatment with Dr. Allen, who diagnosed post-traumatic stress disorder and informed him of the diagnosis on December 11, 2000.

He was placed on medical leave on January 19, 2001, and has not worked since. He applied for disability retirement shortly thereafter. It was approved following evaluations by Drs. Ruth and Ludwig, both of whom provided evidence in this claim.

Initially he testified, as he understood it, that he suffered no "physical" injuries as a police officer. Later he acknowledged he had been involved in dangerous scuffles on at least two occasions. He did sustain "bruises and abrasions" in the incidents, but sought no medical treatment.

Dr. Ludwig, a psychiatrist, diagnosed major depressive disorder and post-traumatic stress disorder. He attributed the conditions entirely to the claimant's exposure to scenes of violence and death in his work. In his opinion, they were permanently and totally disabling with regard to the claimant's ability to work as a police officer.

Dr. Ruth, a psychiatrist, examined the claimant and concluded that he could not return to work as a police officer. In his opinion, the claimant's post-traumatic stress disorder was caused by repeated exposure to signs of violence while investigating crime scenes. He assigned a 15% AMA impairment under the last edition that provided percentage ratings.

Dr. Allen, the treating clinical psychologist, took a history consistent with that to which the claimant testified. He diagnosed post-traumatic stress disorder due to the cumulative stress of the claimant's work. He thought that, with treatment, the claimant would be able to perform work other than as a police officer.

In a supplemental report, Dr. Allen stated the claimant reported several occasions in which he was injured while in the line of duty and that some of those altercations reappeared consistently in his nightmares. In one particular event, he found it necessary to pull his gun on a knife-wielding assailant following a fight in which he was injured. In Dr. Allen's opinion, repeated physical harm or threat of physical harm had increased the claimant's general level of arousal and anxiety. He concluded, therefore, that the physical nature of the claimant's work and "consequent or potential injuries" were "an important part of the core experiences which led to his Post-Traumatic Stress Disorder."

When deposed by the employer, Dr. Allen was questioned about whether any physical events in which the claimant was involved had evoked the intense fear, helplessness, or horror that the DSM–IV required for a diagnosis of post-traumatic stress disorder. He stated that during physical altercations, such as being confronted by a knife-wielding husband during a domestic disturbance, the thought that one might be injured significantly is going to occur and did occur to the claimant. He stated that such events happened "within the context of a much larger picture of very traumatic, horrific events and situations that he has dealt with." He characterized any attempt to attribute the claimant's condition to any particular event as splitting hairs.

When questioned further about any physical injuries claimant may have reported, Dr. Allen noted that it was not his experience for an individual to report a medical problem such as a cut that required stitches as being a significant injury unless it required ongoing medical treatment. Dr. Allen explained that two classes of situations were involved, (1) situations in which the claimant perceived the potential of personal harm and (2) those in which he witnessed extraordinarily horrific crime scenes. He attributed the claimant's condition to the cumulative effects of all of his experiences as a police officer, particularly to the CSI investigations. He viewed claimant's investigation of the 1996 shooting of two of his fellow officers as being significant in precipitating his symptoms.

Dr. Granacher examined claimant and performed psychological testing. He reported that claimant sustained a 20% whole-body psychiatric impairment due to post-traumatic stress disorder. He attributed the condition to the cumulative emotional stress of claimant's work, noting that the condition is common in police and fire personnel. He thought that claimant could be productive and successful in a different type of work. In Dr. Granacher's opinion, claimant's post-traumatic

stress disorder was due to "psychological events" and was in no way a direct result of a "physical injury," as he interpreted it.

More illuminating to this discussion, Dr. Granacher also testified that people suffering from PTSD will have nightmares and flashbacks of the events that caused the disorder. This is entirely consistent with claimant's nightmares and flashbacks (hauntings), where he relives the gruesome crime scenes he's worked, as well as the life-threatening events he personally experienced as an officer.

After summarizing the evidence, the ALJ noted that the case turned on whether claimant's psychological, psychiatric, or stress-related condition was a direct result of a physical injury (to the claimant). KRS 342.0011(1). Dr. Allen, in his view, related the condition to a physically traumatic event. Relying instead on testimony from Drs. Ruth, Ludwig, and Granacher, the ALJ determined that claimant's post-traumatic stress disorder and resulting impairment were not a direct result of a "physical injury."

For the purposes of Chapter 342, the word "injury" is a term of art. Before December 12, 1996, KRS 342.0011(1) defined "injury" as being a harmful change in the human organism. Since December 12, 1996, KRS 342.0011(1) has defined an "injury" as being a "work-related traumatic" event, or series of such events, that cause a harmful change in the human organism. In the same view, the statute requires that a psychological, psychiatric, or stress-related change in the human organism must be "a direct result of a physical injury."

Noting that KRS 342.0011(1) now defines an "injury" as being a traumatic event, or series of events, rather than a harmful change, this court determined in *Lexington–Fayette Urban County Government v. West,* 52 S.W.3d 564 (Ky.2001), that a psychological, psychiatric, or stress-related change in the human organism must directly result from a "physically traumatic event" or series of events in order to be viewed as being an injury. However, it was unnecessary for every traumatic event in a series causing psychological or psychiatric harm to involve physical rather than emotional trauma. *Id.* at 567.

In *West,* this court addressed the facts that were present and to be considered on remand, stating that if the first in a series of traumatic events involves physical trauma and if the event is a direct and proximate cause of the worker's psychological harm, the worker has sustained an "injury" under KRS 342.0011(1). *Id.* Like Officer West, claimant sustained both physical and emotional trauma, but in his case the emotional trauma was due to a frequent exposure to scenes of graphic physical violence. He supported his claim with evidence conducive to a belief that his PTSD was caused by a mixture of "physically traumatic events" to himself and others.

In this case, the medical evidence is unanimous; the claimant suffers from PTSD. With this in mind, it is important to point out that one of the DSM–IV diagnostic criteria for PTSD is a requirement that the person experienced or witnessed or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of self **or others**.[1] It is notable that included among those who are particularly susceptible to PTSD, due to the frequency of their exposure to such events, are "first responders," such as soldiers, police officers (as in the case at bar and *West* ), firefighters and rescuers. One

---

1. American Psychiatric Association Diagnostic and Statistical Manual of Mental Disor-   ders, Fourth Edition.

need only recall the numerous veterans with PTSD that have returned physically unscathed from war, yet mentally or emotionally damaged by the shock, or gruesomeness, of what physically happened to others.

A thorough understanding of the circumstances which led the legislature to revise the definition of injury in KRS 342.0011(1) in 1994 and to impose even more sweeping amendments to the Kentucky Workers' Compensation Act in 1996 includes the knowledge that it was largely in response to what many considered a lack of "objectivity" in who was truly injured and deserving of compensation benefits by reason of disability produced by work. Thus, the legislature enacted more precise guides and criteria as a requisite for compensability. This included the mandatory use of the AMA's Guides to the Evaluation of Permanent Impairment pursuant to KRS 342.730 and revision of certain definitions in KRS 342.0011. KRS 342.0011(1), (11), and (33)-(36). However, none of the amendments signaled an intention on the part of the General Assembly to retreat from the well-established concept that workers' compensation statutes are to be interpreted in a manner consistent with their munificent and beneficent purpose. *Jewish Hospital v. Ray,* 131 S.W.3d 760 (Ky.App.2004); *Dick v. International Harvester Co.,* 310 S.W.2d 514, 515 (Ky.1958); *see also* KRS 446.080.

The operative language of KRS 342.0011(1) which was seen as an impediment to compensability by the Administrative Law Judge in the case at bar is that which states that ... "injury" ... shall not include a psychological, psychiatric, or stress-related change in the human organism, unless it is a direct result of a physical injury. Certainly, if the "physical injury" referred to must be an injury to the disabled worker seeking compensation, then it was within the ALJ's authority to rely on Drs. Ruth, Ludwig, and Granacher, rather than Dr. Allen. However, given the DSM–IV criteria referred to above, which includes threats and injuries to others, the definition of injury should be construed as meaning that the "physical injury" or "physically traumatic event," or events, which must constitute a nexus between the psychological injury and physical injury, may include events involving physical trauma to others. Such an interpretation promotes the munificent and beneficent purpose of the Act while maintaining objectivity. It is consistent with *West* and medical science, and more importantly, emphasizes the significance of the "physically traumatic event," or events, which we held in *West* as the meaning of "physical injury" under KRS 342.0011(1) post December 12, 1996.

LAMBERT, C.J., and GRAVES, J., join this dissent.