# IN THE SUPREME COURT OF IOWA

No. 21–0841

Submitted January 20, 2022—Filed June 3, 2022

**MANDY TRIPP,**

Appellant,

vs.

**SCOTT EMERGENCY COMMUNICATION CENTER** and **IOWA MUNICIPALITIES WORKERS' COMPENSATION ASSOCIATION,**

Appellees.

Appeal from the Iowa District Court for Scott County, Mark Cleve, Judge.

An emergency dispatcher appeals the denial of her claim for workers' compensation benefits based on post-traumatic stress disorder. **REVERSED AND REMANDED.**

McDermott, J., delivered the opinion of the court in which Christensen, C.J., and Appel and Oxley, JJ., joined. Christensen, C.J., filed a concurring opinion. Waterman, J., filed a dissenting opinion, in which Mansfield and McDonald, JJ., joined.

Andrew W. Bribriesco (argued) and Gabriela Navarro of Bribriesco Law Firm, Bettendorf, for appellant.

Chandler M. Surrency (argued) and Jane V. Lorentzen of Hopkins & Huebner, P.C., Des Moines, for appellees.

**McDERMOTT, Justice.**

This case requires us to determine whether Iowa's workers' compensation statute places on emergency responders a different, higher bar to be eligible for benefits for trauma-induced mental injuries suffered on the job than workers in other roles with identical injuries.

Mandy Tripp, a sixteen-year veteran of Scott County's emergency dispatch system, answered a 911 call from a woman screaming over and over at a high pitch, "Help me, my baby is dead." The woman's screams continued for more than two minutes. Tripp eventually got the woman's address and dispatched first responders. She soon heard a report from a police officer that arrived on the scene about finding a dead infant that appeared to have been attacked with a claw hammer.

In the months that followed, Tripp couldn't shake the mother's screams from her mind or her ears. Loud noises, in particular, would trigger debilitating anxiety. Tripp sought medical help. A counselor and two doctors diagnosed her with PTSD resulting from the call. She was prescribed medication to address the PTSD and wore special headphones to drown out loud noises, sometimes even wearing special musicians' earplugs under larger noise-canceling headphones. It helped, but not enough. Tripp found herself unable to perform her job duties as an emergency dispatcher as she had before.

Iowa's workers' compensation law permits workers to receive compensation for injuries that they suffer arising from and in the course of their jobs. Injuries from mental trauma suffered on the job have long been recognized

as a basis to provide workers' compensation. But when Tripp applied for workers' compensation based on her PTSD, her request was denied. Tripp didn't satisfy the test of legal causation, according to the workers' compensation commissioner and district court, because 911 dispatchers routinely take calls involving death and traumatic injury, and the mother's harrowing call thus wasn't an "unexpected cause or unusual strain." Tripp appeals. Because Tripp has established that her PTSD resulted from a manifest happening of a sudden traumatic nature from an unexpected cause or unusual strain, we hold she is entitled to workers' compensation benefits.

## I.

Tripp began her career as an emergency dispatcher in 2002, first with the Davenport Police Department and then (when the police department's emergency dispatch system later combined with the county's system) with the Scott County Emergency Communications Center (SECC). Tripp soon was tabbed to train other emergency dispatchers. In a typical workday, Tripp estimated that she answered anywhere from 50 to 200 calls, including 911 emergency and nonemergency calls and administrative calls. An average call lasts thirty-five seconds.

On September 30, 2018, Tripp answered a 911 call from a woman "screaming at a very high pitch, 'Help me, my baby is dead. Help me, my baby is dead,' over and over and over." The screaming continued for two minutes and fifteen seconds. Tripp struggled to calm the women enough to get an address to dispatch an ambulance. She ultimately got an address and transferred the call

to a medical dispatcher who tried to instruct the mother on lifesaving measures until the ambulance arrived.

Tripp continued to hear ongoing radio traffic about the incident after she transferred the call. She heard the medical dispatcher tell the mother how to perform CPR on an infant. She heard the emergency medics who arrived by ambulance at the scene say that "[r]igor was already set in." And she heard police officers talking about "a potential crime scene" at the mother's home. Injuries to the child's face, according to one investigating officer speaking over the radio, suggested that the child had been beaten with a claw hammer. All the while, the child's mother screamed in the background.

Tripp's supervisor asked Tripp if she needed a break. Tripp declined, responding that she "needed another call" to get the mother's screams "out of my head." Tripp texted her husband, Dennis, a Bettendorf Police Officer with twenty-three years' experience in law enforcement. She told him that she'd taken "a really bad phone call" and needed to talk to him just to hear another voice. It was, according to Dennis, the first time that she'd ever requested such a thing. Tripp remained at work and continued taking calls until her shift ended.

In the days that followed, Tripp was on the verge of tears, didn't want to answer calls, and didn't want to talk with anyone. Although she had taken emergency calls involving serious injuries to children in the past from people at the scene of fatal incidents, including three calls involving a dead infant, she had never before answered a call from a dead child's own mother. Tripp described the mother's screams as something beyond "normal" sounds: "guttural, awful."

Tripp confided to her supervisor and several coworkers that she was struggling to deal with the call. She found herself constantly crying, unable to process her emotions, wanting to sleep, and becoming socially withdrawn.

Tripp initially sought treatment with Lisa Beecher, a licensed mental health counselor, to help her address her mental health, which had been in a state of freefall since the call. Tripp's employer approved the visit. Tripp saw Beecher at least five times over about a three-week period. Beecher diagnosed Tripp with post-traumatic stress disorder, a mental health condition commonly referred to by its acronym: "PTSD." Tripp took two weeks off work at Beecher's suggestion. When she returned to work, she did so with restricted hours.

Beecher soon determined that Tripp's condition wasn't improving. Beecher referred her to a psychologist, Dr. Robert Gillespie, who had treated other Davenport first responders and police officers. Gillespie also diagnosed Tripp with PTSD. He instructed her to seek medication from her regular physician to treat it. Tripp's physician prescribed her an antidepressant. Tripp took the prescribed antidepressants and continued to see Beecher for counseling and Gillespie for psychotherapy to treat her PTSD.

Gillespie's notes of his meeting with Tripp in April 2019 (more than six months after the call) recount that Tripp had been having suicidal feelings at work but had been able to work through them. She continued to struggle with "heightened levels of emotional responsivity" brought on by certain sounds, particularly high-pitched voices. And she continued to experience episodic

recurrence of traumatic stress, but with some improvement in the frequency and intensity of the episodes.

In September 2019, another psychiatrist, Martin Carpenter, M.D., performed an independent psychiatric evaluation of Tripp for this litigation. He also diagnosed Tripp's condition as PTSD. Carpenter consulted the *Diagnostic and Statistical Manual of Mental Disorders* (the DSM-5), the fifth edition of a diagnosis manual for psychological disorders, in making his diagnosis. The DSM-5 states that PTSD can result from exposure "to actual or threatened death," either through directly experiencing a traumatic event or experiencing "repeated or extreme exposure to aversive details of" a traumatic event. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 271 (5th. ed. 2013). Carpenter recommended that Tripp, on top of her ongoing prescription drug treatment, use physical interventions to address her PTSD symptoms. Among other things, Carpenter recommended that she wear special earplugs to limit hearing loud noises, which were a significant trigger of anxiety since the incident.

Tripp filed an application for workers' compensation benefits based on her PTSD. At the evidentiary hearing, both Beecher and Gillespie's reports found that Tripp's PTSD resulted directly from her involvement in the traumatic events of the mother's 911 call. Gillespie noted that the fourth edition of the DSM "explicitly contemplates the exposure risk for first responders, such as 911 operators." Gillespie testified to his opinion that, by May 2019, Tripp had reached "maximum medical improvement"—in other words, had achieved all the

improvement that she reasonably would ever be expected to achieve—as to her PTSD. Tripp's PTSD thus, according to Gillespie, constituted a "chronic episodic condition" resulting in a permanent disability.

Carpenter similarly found that Tripp's diagnosis resulted directly from the events of the mother's 911 call. He concluded that Tripp's condition satisfied the PTSD criteria in the DSM-5 as a "traumatic exposure" in which she experienced a mother's discovery of a dead child in vivid and disturbing fashion. Carpenter also agreed that Tripp had reached maximum medical improvement and that she'd need both ongoing pharmacological management and psychotherapy to treat her PTSD.

Tripp's employer, the SECC, contested her petition for workers' compensation and called three of Tripp's coworkers to testify at the evidentiary hearing: a medical dispatcher with twenty-four years' experience (in fact, the same medical dispatcher who instructed the mother on CPR), the SECC's director (who previously worked as a dispatcher), and the SECC's deputy director (who also previously worked as a dispatcher). Each testified to their belief that calls such as the one that brought on Tripp's PTSD weren't unusual or unexpected. They provided various estimates of similar calls based on their experience. One acknowledged that she'd fielded around 141,000 calls in her career and about a dozen involved an infant's death; another estimated she'd taken about 572,000 calls of which fifteen involved a child's death. Tripp's current supervisor testified that the SECC provided Tripp with accommodations for her PTSD, including light-duty work, changing her seating arrangement when

possible, and allowing her to leave if she experiences an anxiety-triggering call. No witness disputed any testimony from Tripp's medical professionals.

Tripp agreed that fielding a 911 call from a distraught person was neither unexpected nor unusual in an emergency dispatcher's work and that speaking with crying or even incoherent callers was a normal part of the job. Tripp also acknowledged that she'd fielded traumatic calls since the incident, including a call involving the suicide of a teenager (which, as reported in Gillespie's notes, caused Tripp to hear the mother's screams in her head from the earlier call and to start crying). And despite her sensitivity to loud sounds since the call, Tripp had personally attended a large business convention, although she wore noise-canceling headphones on top of musician's earplugs during the convention. Tripp applied for a job as a librarian because of her sensitivity to sound. Tripp still tries, in her words, to "participate in life" despite her PTSD and wants to continue to work as an emergency dispatcher to the extent she's able to because she "love[s] the job."

Her husband Dennis testified that after the call, his wife had become withdrawn and unable to engage in many normal social activities, primarily because of her new sensitivity to loud sounds. Dennis saw some improvement in her condition from the psychotherapy and prescription drug treatments. He agreed that 911 operators anticipate taking emergency calls by nature of their jobs and agreed that a parent whose infant was dying would call 911 and be distraught. Dennis, for his part, has never in his career been called to respond

to a matter involving a dead infant and would characterize such an event as unusual.

After hearing the evidence, the deputy workers' compensation commissioner denied Tripp's petition for benefits. Although acknowledging it was "a difficult case," the deputy commissioner held that because 911 dispatchers "routinely" take calls involving death and traumatic injuries, Tripp failed to prove that the PTSD-inducing call was "unusual" or "unexpected" as required under our court's prior mental injury cases. Tripp moved for rehearing, which the deputy denied. Tripp appealed to the workers' compensation commissioner, who affirmed the deputy's decision. Tripp then sought judicial review in the district court, which likewise affirmed the prior ruling. She appeals that ruling.

II.

The parties disagree on our standard of review. Tripp argues that we review for legal error because the standard for establishing a purely mental injury is an issue of law. The SECC argues that we must defer to the commission because legal causation is based on findings of fact, which should be upheld as long as substantial evidence in the record supports those findings.

The commission's decision involves an application of law to the facts and thus presents a mixed question of law and fact. *Meyer v. IBP, Inc.*, 710 N.W.2d 213, 219 (Iowa 2006). If the claimed error pertains to the agency's findings of fact, then "the proper question on review is whether substantial evidence supported those" factual findings. *Id.* But if the claimed error pertains to the agency's interpretation of the law, then the question on review is whether the

agency's interpretation was wrong. *Id.* We don't defer to the commission's interpretation of the legal standard to prove a purely mental injury under Iowa law. *Dunlavey v. Econ. Fire & Cas. Co.*, 526 N.W.2d 845, 849 (Iowa 1995); *see also* Iowa Code § 17A.19(10)(*c*) (2019). That legal standard presents a legal question, and we're thus not bound by the agency's conclusions and instead substitute our own judgment. *Lakeside Casino v. Blue*, 743 N.W.2d 169, 173 (Iowa 2007).

### III.

Iowa's workers' compensation system is a creature of statute, being both conceived and constructed by legislative action. *See Hansen v. State*, 91 N.W.2d 555, 556–57 (Iowa 1958). The system provides mutual benefits and tradeoffs for workers and employers. *Harned v. Farmland Foods, Inc.*, 331 N.W.2d 98, 100 (Iowa 1983) (en banc). Workers relinquish their right to sue the employer for damages on the condition that the employer promptly compensates workers for injuries that arise out of and in the course of employment regardless of fault. *Baker v. Bridgestone/Firestone*, 872 N.W.2d 672, 676–77 (Iowa 2015).

Our analysis centers on Iowa Code section 85.3(1), which establishes a worker's eligibility to receive, and an employer's duty to pay, workers' compensation. It states:

> Every employer . . . shall provide, secure, and pay compensation according to the provisions of this chapter for any and all personal injuries sustained by an employee arising out of and in the course of the employment, and in such cases, the employer shall be relieved from other liability for recovery of damages or other compensation for such personal injury.

Iowa Code § 85.3(1). Interpreting the plain language of the statute, the question presented in this appeal has two parts: (1) whether Tripp's PTSD is a "personal injury," and (2) whether she sustained it "arising out of and in the course of" her job as an emergency dispatcher. If the answer to both parts is yes, she's entitled to compensation; if not, then not.

Does Tripp's PTSD constitute a "personal injury" under the statute? The terms "injury" and "personal injury" are elaborated on, although not necessarily defined, in section 85.61(4). That section states that these terms "shall be construed as follows" and then states that "they shall include death resulting from personal injury" and "shall not include a disease unless it shall result from the injury and they shall not include an occupational disease." *Id.* § 85.61(4)(*a*), (*b*). Neither elaboration provides any help in this case since Tripp didn't die and her PTSD isn't a disease.

In *Dunlavey v. Economy Fire & Casualty Co.*, we analyzed whether an employee's "nontraumatic mental injury"—in that case, major depressive disorder—amounted to a "personal injury" under section 85.3(1). 526 N.W.2d at 849–53. The employer argued that, as a matter of public policy, we should refuse to recognize psychological injuries without an associated physical injury (referred to as a "mental-mental injury") because it would breed fraudulent and unverifiable workers' compensation claims by employees. *Id.* at 856. But after surveying cases from states around the country with similarly-worded workers' compensation statutes, finding no expression by the legislature in our statute to carve out a restriction for purely psychological injuries, and further finding "no

really valid distinction between physical and 'nervous' injury," we held that psychological injuries met the definition of "personal injuries" under the statute. *Id.* at 851, 853 (quoting 1B Arthur Larson, *The Law of Workmen's Compensation* § 42.23(a), at § 7-906 (1993)). As to whether PTSD in particular qualifies, in *Brown v. Quik Trip Corp.*, we held that a convenience store clerk's PTSD diagnosis met the definition. 641 N.W.2d 725, 727–29 (Iowa 2002). Tripp's PTSD diagnosis thus likewise qualifies as a "personal injury" under the statute.

Turning to the second part of the statutory inquiry: Does Tripp's PTSD arise "out of and in the course of the employment"? In *Dunlavey*, we said that an employee seeking compensation for a mental injury required proof of both "medical causation" and "legal causation." 526 N.W.2d at 853. Medical causation requires the employee to show "that the alleged mental condition was in fact caused by employment-related activities." *Asmus v. Waterloo Cmty. Sch. Dist.*, 722 N.W.2d 653, 657 (Iowa 2006). Legal causation, on the other hand, requires the employee to show that the mental injury resulted from "workplace stress of greater magnitude than the day-to-day mental stresses experienced by other workers employed in the same or similar jobs, regardless of their employer." *Dunlavey*, 526 N.W.2d at 858.

But in *Brown*, we walked back part of the causation burden we'd previously imposed on employees in *Dunlavey*. 641 N.W.2d at 728–29. In *Brown*, we overturned the commissioner's denial of benefits for a convenience store clerk who developed PTSD after seeing a customer get shot and, about a week later, had been held up at work by an apparently armed robber. *Id.* at 726–27. We

formulated a different standard of causation when an employee establishes that the mental injury at issue is "based on a manifest happening of a sudden traumatic nature from an unexpected cause or unusual strain." *Id.* at 729. Such a situation meets the legal-causation test "irrespective of the absence of similar stress on other employees." *Id.* We could dispense with the legal-causation requirement in such a circumstance, we reasoned, because a mental injury that occurred rapidly and could be traced to a specific, sudden event had a sufficiently strong "badge of reliability" (in contrast to a mental injury alleged to have developed gradually over time). *Id.* at 728 (quoting *Graves v. Utah Power & Light Co.*, 713 P.2d 187, 192 (Wyo. 1986), *superseded by statute as stated in Brown,* 641 N.W.2d at 728 n.1).

Neither *Brown* nor any of our cases since have explored the contours of what "manifest happening of a sudden traumatic nature from an unexpected cause or unusual strain" means. *Id.* at 729. The SECC argues that *Brown* requires the factfinder to focus on *that employee's* particular job duties to determine whether the injury-causing incident was an "unexpected cause or unusual strain" under Iowa Code section 85.3(1). Tripp, conversely, in effect argues that *Brown* requires the factfinder to focus on whether the sudden event constitutes an "unexpected cause or unusual strain" in employment life generally, without regard to the regular duties of the particular employee or employees in similar positions. The deputy commissioner adopted the SECC's proposed interpretation. The commissioner and district court agreed, with the district court noting that the "baseline seems to be most appropriately drawn by

looking to the unique features of each particular claimant's experiences—including their ordinary workplace activities."

In *Brown,* we adopted the phrase "manifest happening of a sudden traumatic nature from an unexpected cause or unusual strain" from the test we found in a Montana case, *Tocco v. City of Great Falls*, to determine whether an injury met the legal standard for workers' compensation. *Brown*, 641 N.W.2d at 729 (citing *Tocco v. City of Great Falls*, 714 P.2d 160, 163–64 (Mont. 1986)). But the Montana Supreme Court in *Tocco* was quoting a phrase from Montana's own workers' compensation statute, Montana Code section 39-71-119, defining an "eligible injury." *Tocco*, 714 P.2d at 163–64. The Montana statute defined an "eligible injury," in part, as "a tangible happening of a traumatic nature from an unexpected cause or unusual strain resulting in" certain types of harm. *Id.* (quoting Mont. Code § 39-71-119).

Iowa workers' compensation statute, by comparison, doesn't contain any language stating that injuries must result from an "unexpected cause or unusual strain." Iowa Code § 85.3(1). The relevant part of Iowa's statute to which we applied the "unusual strain" test in *Brown* simply asks whether Tripp's injury "ar[ose] out of and in the course of employment." *Id.* On that inquiry, the evidence was unrebutted (from the testifying doctors, Tripp's husband, and Tripp herself) that her PTSD arose directly from her handling of the screaming 911 call and the reports about the infant's maiming that immediately followed it and that Tripp answered the call in the course of her work as an emergency dispatcher for the SECC.

Focusing on the employee's own job in determining an "unexpected strain" places workers routinely tasked with addressing traumatic incidents, such as emergency dispatchers, paramedics, police officers, and firefighters, in a *disfavored* position as compared with other workers. They would bear a burden to prove *hyper*-unexpected causes and *hyper*-unusual strains—some extraordinary species of traumatic event, above and beyond the perilous events that they regularly confront—to qualify for benefits that those in less hazardous professions receive by meeting a far lower bar. Yet nothing in the language of *Brown*—nor, more importantly, in the text of section 85.3(1)—makes the "unexpectedness" or "unusualness" of the traumatic event dependent on the employee's own job duties. We thus hold that the district court erred in its interpretation of the statute in ruling otherwise.

This holding aligns with our existing workers' compensation law. If a police officer, for instance, is physically injured in a crash while pursuing a suspect in a high-speed chase, her injury ordinarily would be compensable despite the fact that police officers often pursue dangerous, fleeing suspects. But if an officer with a pre-existing heart condition has a heart attack on the job, the officer must still prove "that the injury arose out of the employment." *P.D.S.I. v. Peterson*, 685 N.W.2d 627, 630 (Iowa 2004). Applying our mental injury cases as we do today treats mental injuries in a similar fashion. For mental injuries "based on a manifest happening of a sudden traumatic nature from an unexpected cause or unusual strain" legal causation is established without regard to the regular duties of the particular employee or other employees in similar positions. *See*

*Brown,* 641 N.W.2d at 728–29. But for mental injuries that might result from a combination of work- and non-work-related factors, the claimant must prove both legal and medical causation. *See Peterson,* 685 N.W.2d at 630; *Dunlavey,* 526 N.W.2d at 856–57.

The dissent never cites to, let alone analyzes, the actual text of the statute on which this case turns. The dissent's preferred application of the statute is premised on a fear that, unless courts require emergency responders to prove *hyper*-unusual work events caused their PTSD, emergency responders will make (and reap the benefits of) fraudulent PTSD claims. The dissent recites, for instance, that our causation test in *Dunlavey* for mental-mental injuries sought to address "difficulties in the evaluation of psychological injuries, such as the ease with which such claims may be feigned and the difficulty with which fraudulent claims can be detected." (Quoting *Dunlavey,* 526 N.W.2d at 855.) The dissent refers to our choice of the causation test in *Dunlavey* as "mindful" of an argument "that once 'mental/mental' claims are deemed compensable, employees will increasingly make fraudulent claims which the courts will not be able to detect and which will ultimately force employers out of business." (Quoting *id.* at 856.) Stated in its purest form, the dissent believes that its approach to proving the unusualness of the PTSD-causing event will prevent "fraudulent claims that are difficult to disprove."

On this subject, the dissent fights a battle that the SECC doesn't. The SECC doesn't claim that Tripp's PTSD diagnosis is "fraudulent" or unproven, or

that it wasn't causally connected to Tripp's employment.[1] No party in this appeal disputes that the 911 call *in fact caused* Tripp's PTSD. There is no claim of fraud, and there is no question of causation. The dissent instead presents a legislative policy rationale that it then superimposes on the text of the statute to support its interpretation. "Presumably," the dissent writes, "the legislature was unwilling to open the floodgates to mental injury claims as they are difficult to disprove and increase insurance costs while inhibiting job creation." Yet no hint of any of the things that the dissent "presumes" here are found anywhere in the statute or in this record.

Lest we lose sight of the polestar for our legal analysis in this case, we must interpret our own causation test in harmony with the words of the workers' compensation statute. The role of this court is to apply the words "of a statute as written." *In re Marshall*, 805 N.W.2d 145, 160 (Iowa 2011). "[W]e may not—under the guise of statutory construction—enlarge or otherwise change the terms of a statute as the legislature adopted it." *State v. Miller*, 590 N.W.2d 45, 47 (Iowa 1999). For us to interpret the statute to achieve some policy objective found nowhere in the statute's language—to presume the statute requires a higher standard of proof for PTSD based on fears of fraud—invades a sphere reserved for the legislature. *See In re Est. of Gist*, 763 N.W.2d 561, 567–68 (Iowa 2009).

---

[1]All the dissent's quotations from *Dunlavey* about fears of fraudulent mental-mental claims, it's worth noting, relate to the *legal causation* standard that has no application to Tripp's case in light of the holding in *Brown*.

The existence of any system of insurance, including workers' compensation, brings with it the potential for abuse. But the solution to this problem resides in the truth-seeking function of the adversary process, in which the trier of fact "considers expert testimony with an eye toward the concern that the claimant may be malingering, exaggerating his or her injuries, or attempting to claim an injury unrelated to employment." Travis J. Foels, *Rescuing the Rescuer: Reforming How Florida's Workers' Compensation Law Treats Mental Injury of First Responders*, 69 Fla. L. Rev. 1439, 1463 (2017). The workers' compensation system "already depend[s] on triers of fact to detect and weed out fraudulent or illegitimate claims." *Id.* Our court thus shouldn't presume it needs to cure some perceived legislative inattention by foreclosing recovery for a class of injuries that might otherwise qualify under the statute. "Our task is to interpret the statute, not improve it." *Brakke v. Iowa Dep't of Nat. Res.*, 897 N.W.2d 522, 541 (Iowa 2017).

The dissent relies heavily on *Moon v. Board of Trustees of Municipal Fire & Police Retirement System of Iowa*, in which we applied *Dunlavey*'s causation test to a disability claim by a police officer seeking benefits under Iowa Code chapter 411. 548 N.W.2d 565, 568 (Iowa 1996). In that case, an officer became permanently disabled after developing a panic disorder and agoraphobia after a confrontation with an armed robbery suspect and the suicide of a fellow officer. *Id.* at 567. We denied benefits under the *Dunlavey* test because the disabled officer failed to establish that these incidents were "more than the day-to-day stresses commonly associated with police departments," citing to testimony from

another officer that "[t]here's a lot of stress associated with the job" and similar testimony from other officers. *Id.* at 569–70. But *Moon*, and another case the dissent recites, *City of Cedar Rapids v. Board of Trustees of Municipal Fire & Police Retirement System of Iowa*, 572 N.W.2d 919 (Iowa 1998), offer little of substance to our analysis in light of *Brown*'s later reconstruction of the causation standard for "readily identifiable" events causing mental injury, as in this case.

Workers' compensation statutes are generally unique to each state, but several courts in other jurisdictions, interpreting statutes similar to Iowa's, have likewise held that purely mental injuries are compensable under an objective standard when the injury is caused by a readily-identifiable or directly-traceable event. For instance, the Oregon Supreme Court held a claimant's mental injury was compensable because his injury resulted from "actual stress conditions at work when viewed objectively." *McGarrah v. State Accident Ins. Fund Corp.*, 675 P.2d 159, 172 (Or. 1983). Oregon's statute defined a compensable "occupational disease" as "[a]ny disease or infection which arises out of and in the scope of the employment, and to which an employee is not ordinarily subjected or exposed other than during a period of regular actual employment therein." *Id.* at 169 (quoting Or. Rev. Stat. § 656.802).

The Arizona Supreme Court permitted recovery for an officer who developed PTSD after a shootout with a gunman during a welfare check. *France v. Indus. Comm'n of Ariz.*, 481 P.3d 1162, 1163, 1167 (Ariz. 2021). The court rejected the employer's claim that the officer needed to "prove that the injury-causing event was outside the scope of his assigned job duties" because under

that standard "a deputy who suffers mental injuries caused by a gunfight, regardless of the circumstances, could never receive compensation because such an incident might possibly occur in the line of duty." *Id.* The court emphasized that its holding was "limited to mental injuries arising from a specific work-related incident" and distinguished cases involving "gradual injuries resulting from ordinary stresses and strains of the work regimen." *Id.*

The Appellate Court of Illinois approved benefits for a police officer after he developed PTSD following a standoff with someone he believed to be wielding a gun. *Diaz v. Ill. Workers' Comp. Comm'n*, 989 N.E.2d 233, 235–36 (Ill. App. Ct. 2013). The court rejected the commission's conclusion that the officer couldn't "recover because the traumatic incident was not an uncommon event of significantly greater proportion than what he would otherwise have been subjected to in the normal course of his employment as a police officer." *Id.* at 241–42. Such a standard, the court noted, would make it "virtually impossible for police officers or others involved in dangerous occupations to qualify for a mental-mental claim." *Id.* at 242. The court distinguished the incident from "a gradually developing mental disability" and found the appropriate standard for "whether a worker has suffered the type of emotional shock sufficient to warrant recovery should be determined by an objective, reasonable-person standard, rather than a subjective standard that takes into account the claimant's occupation and training." *Id.* at 241–42.

The Supreme Court of Louisiana likewise found that for "cases involving such *readily identifiable,* unusual and dramatic events," the claimant must be

compensated "when there is sufficient evidence that the sudden event caused the disabling mental condition." *Sparks v. Tulane Med. Ctr. Hosp. & Clinic*, 546 So. 2d 138, 147 (La. 1989) (emphasis added). But "an employee's general allegation that he is unable to work due to stress or tension caused by working conditions," according to the court, "would not give rise to a compensable claim." *Id.*

The national landscape shows increasing support for laws that ensure emergency responders have an opportunity to receive workers' compensation benefits for PTSD. "A vigorous trend is for states to make exceptions, within exclusionary laws, for first responders via the legislative 'presumption of causation' device." David B. Torrey & Donald T. DeCarlo, *Mental Stress Causing Mental Disability Under Workers' Compensation Laws: A Short History, the Competing Arguments, and A 2021 Inventory*, 56 Tort Trial & Ins. Prac. L.J. 91, 134 (2021). The National Council on Compensation Insurance, "which carefully monitors proposed bills and enactments on this topic," identified PTSD bills ensuring eligibility for emergency responders as "the top trending issue for 2019." *Id.* at 134–35, 173 (showing seventeen states with enacted legislation at the time of the article's publication and another seventeen states with some kind of proposed legislation).

What's more, making it harder for emergency responders to receive workers' compensation for mental injuries would rest on a dubious assumption: that emergency responders have, or *should* have, some natural or acquired immunity to psychological injuries that might result from participating in

traumatic human experiences. Few people, if any, could know if they possess such an immunity going in. And none would know for certain that they'd be able to maintain it. Tripp's PTSD diagnosis, by all accounts, is a case in point: she was always able to deal with the trauma of the job for sixteen years until, one horrific day, she wasn't.

Setting different baselines for proving workers' compensation eligibility—one for emergency responders and one for everyone else—further presupposes that emergency responders agreed to assume the risk of suffering psychological injuries simply by accepting the job. The legal basis for this "assumption of risk" notion is unclear; it's certainly found nowhere in this record. In any event, our workers' compensation statute embodies a "no fault" system: employers are not liable for their negligence in causing a workplace injury and workers are not subject to a setoff in benefits for their own conduct that might have contributed to their injury. *See Peterson*, 685 N.W.2d at 635. Workers thus can't be denied benefits based on a common law "assumption of risk" defense to an injury claim. *Hawk v. Jim Hawk Chevrolet-Buick, Inc.*, 282 N.W.2d 84, 91 (Iowa 1979) (en banc).

Our workers' compensation statute doesn't impose a higher burden on workers with jobs that involve frequent brushes with traumatic events than workers in other occupations. Workers' compensation, it bears repeating, is a statutory creation, with eligibility for benefits determined by what *the statute* provides. *See McSpadden v. Big Ben Coal Co.*, 288 N.W.2d 181, 188 (Iowa 1980). We find it—as we must—not for us to create favored and disfavored

classifications among occupations or injuries when the legislature has made no such classifications in its statute. Allowing emergency responders to receive workers' compensation for their proven mental injuries, without imposing some heightened evidentiary hurdle absent in our statute, merely provides them with the compensation to which they're legally entitled.

IV.

When a purely mental injury is traceable to a readily identifiable work event, the claimant proves legal causation by meeting the test that we set forth in *Brown* by analyzing the unexpected or unusual nature of the injury-inducing event without regard to the claimant's own particular duties. Tripp satisfied the requirements for medical and legal causation. We thus reverse the decision of the district court and remand the case to the workers' compensation commissioner to determine the extent of Tripp's disability.

**REVERSED AND REMANDED.**

Christensen, C.J., and Appel and Oxley, JJ., join this opinion. Christensen, C.J., files a concurring opinion. Waterman, J., files a dissenting opinion, in which Mansfield and McDonald, JJ., join.

**CHRISTENSEN, Chief Justice (concurring specially).**

I agree with the majority that our court in *Brown v. Quick Trip Corp.*, 641 N.W.2d 725, 728–29 (Iowa 2002), walked back the causation burden we previously imposed on employees in *Dunlavey v. Economy Fire & Casualty Co.*, 526 N.W.2d 845, 854–59 (Iowa 1995), for cases of a manifest happening of a sudden traumatic nature from an unexpected cause or unusual strain. *See Asmus v. Waterloo Cmty. Sch. Distr.*, 722 N.W.2d 653, 657 n.1 (Iowa 2006) ("In the later case of *Brown v. Quik Trip Corp.*, we formulated a different standard [than *Dunlavey*] for those situations in which the mental injury can be readily traced to a specific event." (citation omitted)). Nevertheless, I write separately to discuss the statistics of this particular event and the higher rates of PTSD among first responders. I also write to propose that our state legislature adopt a statute similar to Minnesota's that provides a rebuttable presumption that a PTSD diagnosis was caused by the first responder's job.

**I. Statistical Data Puts the Claim that the Call was not an Unexpected Cause or Unusual Strain in Tripp's Profession into Doubt.**

The deputy commissioner held that "[g]iven the nature of the job of a 9-1-1 dispatcher, taking a call regarding a dying or dead infant cannot be said to be an unexpected cause or an unusual strain." It drew this conclusion from the testimony of Tripp, former Scott Emergency Communication Center 911 dispatchers turned supervisors Denise Pavlik and Tracey Sanders, and the MEDIC EMS Jill Cawiezell. These witnesses each indicated that it was not uncommon for a 911 dispatcher to handle calls that involve distraught callers

and life-or-death situations. There was also testimony from dispatchers Tripp, Pavlik, and Cawiezell indicating that they each fielded multiple infant death calls throughout their careers. The commissioner effectively adopted the deputy commissioner's analysis, and the district court determined substantial evidence supported their conclusions.

Evidence undoubtedly establishes that a 911 dispatcher normally handles calls involving distraught callers and life-or-death situations. But the relatively routine nature of these calls does not prevent such a call from being classified as a sudden, traumatic, and unexpected event. For example, a convenience store clerk normally interacts with store visitors and cleans up the store. Those general responsibilities do not prevent the possibility that some interactions or cleaning tasks, such as being a victim in a robbery or cleaning up blood from a shoot-out, can be sudden, traumatic, or unexpected events. *Cf. Brown*, 641 N.W.2d at 726–27.

To an extent, statistics can be helpful in analyzing whether a sudden, traumatic, or unexpected event has occurred. *See, e.g., Brown v. Quik Trip Corp.*, No. 00–0868, 2001 WL 1132735, at *3 (Iowa Ct. App. Sept. 26, 2001) (en banc), *vacated*, 641 N.W.2d 725. For example, in *Brown*, "[t]o rebut the claimed legal causation, appellee Quik Trip offered an exhibit showing statistics as to occupational incidents in 1995," which indicated that in the United States in 1995, thirty-six convenience store clerk fatalities occurred and 0.027% of convenience store clerks had suffered nonfatal injuries from violence. *Id.* at *3 & n.2. The commissioner in *Brown* concluded that these statistics "reflect[] that

these experiences are quite common for the industry in which he is employed." *Id.* at *2. Those statistics were unimpressive to the court of appeals, as both opinion writers suggested that the statistics did not provide substantial evidence that violent acts committed on convenience store clerks were "quite common." *Id.* at *3 ("Given the available statistics regarding the low incidence of death or injury of gas station attendants due to violence on the job, we would question whether the commissioner's conclusion that violent acts are 'quite common' in the gas station business is supported by substantial evidence."); *id.* at *5 (Hecht, J., concurring in part and dissenting in part) ("After a careful review of the data, I conclude the data proves beyond dispute the rarity of the incidence of assaults and violent acts in occupations similar to Brown's.") (footnote omitted)).[2]

Similarly, the majority's case of *France v. Industrial Commission of Arizona*, 481 P.3d 1162 (Ariz. 2021), used statistics to determine whether an attack on a law enforcement officer, who then shot and killed his attacker, during a welfare check, qualified as an unexpected, unusual, or extraordinary event. *Id.* at 1166–67. In that case, "several law enforcement officers with many years of service testified that, while they are trained and prepared to use lethal force in the line of duty, they had never been involved in a gunfight." *Id.* at 1167. Furthermore, "evidence showed that officer-involved shootings in Gila County were extremely rare, with fewer than ten such incidents occurring over the past forty years." *Id.*

---

[2]On further review to the Iowa Supreme Court, Quik Trip appeared to abandon this statistical argument and solely argued that Brown failed to prove legal causation by not "produc[ing] testimony of similarly situated employees to establish his claim of legal causation." *Brown*, 641 N.W.2d at 729.

Based on the testimony and statistics, the court granted the officer's claim. *Id.* ("In short, the Shooting Incident is not the type of incident that is part of a law enforcement officer's daily routine, nor is it expected that a deputy will face such a dramatic brush with death in responding to a welfare check.").

I turn to some relevant statistics as applied to this case. In 2018, 188 infants died in Iowa. Nat'l Ctr. for Health Stat., U.S. Dep't of Health & Hum. Servs., *Infant Mortality Rates by State* (Mar. 3, 2022), https://www.cdc.gov/nchs/pressroom/sosmap/infant_mortality_rates/infant_ mortality.htm [https://perma.cc/9MRX-R5ZU] (click 2018 under the "Year" filter) (classifying an infant as under one year old). In 2018, 990 emergency dispatchers worked in Iowa. U.S. Bureau of Lab. Stat., U.S. Dep't of Lab., *Occupational Employment and Wage Statistics* (Apr. 4, 2022), https://www.bls.gov/oes/tables.htm (click on State XLS spreadsheet for May 2018). A rough estimate indicates that an Iowa emergency dispatcher could expect to receive a call involving a dead infant once every five years (990 divided by 188 equals 5.27). This estimate, of course, assumes several variables, such as all infant deaths involved a 911 call, no repeats occurred among Iowa emergency dispatchers, and the amount of Iowa emergency dispatchers and infant deaths remain static over several years. That being said, this rough percentage is relatively consistent with Tripp's experience (four calls over seventeen years) and Pavlik's experience (three calls over twenty-two years).[3]

---

[3]Pavlik indicated that she had heard fifteen child-death-related calls. On cross-examination, Pavlik was asked how many involved the caller stating, "my baby is dead." Those calls amounted to three.

But diving further, the specific nature of this 911 call does stand out. There was evidence to suggest that the cause of death was a homicide: a report that the infant's head had been maimed with an object consistent with a claw hammer. Tripp's testimony indicated that the dispatchers in the room gasped after hearing that the cause of death may have been a murder. If seasoned dispatchers had a visceral reaction such as this, it could be a strong indicator that the event was traumatic, sudden, or unexpected.

Moreover, the homicide of infants is extremely rare statistically. In Iowa, between 2016 and 2019, approximately less than ten infants died from homicide. *See* Ctrs. for Disease Control & Prevention, *2019, 2018, 2017, 2016, NVDRS: IA All Victims Death Counts and Rates per 100,000 Homicide, All Mechanisms, All Races, Both Sexes, Age 0,* https://wisqars.cdc.gov/nvdrs/ (last visited June 6, 2022) (in section 1, select "Crude Rates and Death Counts" under "Death and Rates"; in section 2, uncheck "All Intents" and select "Homicide"; in section 5, select 2016, 2017, 2018, and 2019 under "Year(s) of Report" and Iowa under "Individual State(s)"; under "Advanced Options," select "Single Age Range of <1 to <1";  and click "Submit Request") (noting that "[t]he number of deaths fewer than 10; the number has been suppressed to retain confidentiality"). By applying an average that two Iowa infants died from homicide in 2018, the rough probability, assuming several variables, that any Iowa 911 dispatcher would field a call about a *murdered* infant is around once every five hundred years. These statistics indicate that the situation described by Tripp is something that rarely happens, even in her line of work. With these statistics, I am skeptical that this

specific event could not be classified as an unexpected cause or an unusual strain.

## II. Further Legislative Action for First Responders.

This case involves the broader issue of higher rates of PTSD among first responders. "First responders are exposed to potentially traumatic events repeatedly while on the job." Nina F Lewis-Schroeder et al., *Conceptualization, Assessment, and Treatment of Traumatic Stress in First Responders: A Review of Critical Issues*, 26 Harv. Rev. Psychiatry 216, 217 (2018) [hereinafter Lewis-Schroeder]; *see Kubajak v. Lexington-Fayette Urban Cty. Gov't*, 180 S.W.3d 454, 463 (Ky. 2005) (Scott, J., dissenting) ("It is notable that included among those who are particularly susceptible to PTSD, due to the frequency of their exposure to such events, are 'first responders,' . . . . "). "Given the high frequency and severity of traumatic exposures, it is not surprising that first responders are at an elevated risk for developing PTSD." Lewis-Schroeder, 26 Harv. Rev. Psychiatry at 217.

Several studies suggest that first responders develop PTSD at a range of 10% to 30% higher than members of the general public. *Id.*; Miriam Heyman, Jeff Dill, & Robert Douglas, *The Ruderman White Paper on Mental Health and Suicide of First Responders* 12 (2018), https://dir.nv.gov/uploadedFiles/dirnvgov/content/WCS/TrainingDocs/First%20Responder%20White%20Paper_Final%20(2).pdf [https://perma.cc/7VYN-A9X9] (describing firefighters develop PTSD at 7% to 15% and police officers develop PTSD at 28% higher than the general population); Substance Abuse &

Mental Health Servs. Admin., *First Responders: Behavioral Health Concerns, Emergency Response, and Trauma* 3 (2018), https://www.samhsa.gov/sites/default/files/dtac/supplementalresearchbullet in-firstresponders-may2018.pdf [https://perma.cc/B8NZ-75D4] ("It is estimated that 30 percent of first responders develop behavioral health conditions including, but not limited to, depression and posttraumatic stress disorder (PTSD), as compared with 20 percent in the general population." (citation omitted)). Some studies believe the disparity between PTSD diagnoses with first responders as compared to PTSD diagnoses in the general population is much higher due to underreporting. Lewis-Schroeder, 26 Harv. Rev. Psychiatry at 217.

911 dispatchers, like Tripp, have an especially important duty in the "rescue chain."

> [911 dispatchers] play a key role in allocating the right resource to patients in emergencies and they must communicate vital information during critical phases of operations. Errors in communications, for example, a wrong treatment priority, will compromise safe and effective patient care. Dispatchers' failures may lead to a delay in care and may contribute to the patient's death. Therefore, although the dispatchers are not at the forefront of the "hands on" rescue, they bear high work-related responsibility.

Marcus Oldenburg et al., *Job-related Stress and Work Ability of Dispatchers in a Metropolitan Fire Department*, 9 J. Occupational Med. & Toxicology 31, 31 (2014) (endnote omitted). In recognition of the work performed by 911 dispatchers, the Iowa Legislature recently classified 911 dispatchers as "first responders." 2020 Iowa Acts ch. 1077, § 2 (codified at Iowa Code § 80B.11C (2021)). Additionally, 911 dispatchers are also subject to higher rates of PTSD than the general public.

Anna Raskin, *PTSD and Emergency Telecommunicators*, J. of Emergency Dispatch (July 6, 2016) https://www.iaedjournal.org/ptsd-in-911-communications-qa [https://perma.cc/D8M8-2999] (detailing the rate of PTSD among 911 dispatchers at between 18% and 24%).

As the majority mentions, several states have enacted a wide variety of legislation to address the higher rates of PTSD among first responders. *See* Caitlin Dryden, *Putting Mental Health on the Frontline: Why Mental Injuries in First Responders Should be Covered through Workers Compensation*, Drexel L. Rev. Blog (Sept. 11, 2020), https://drexel.edu/law/lawreview/blog/overview/2020/September/putting-mental-health-on-the-front-line/ [https://perma.cc/46R2-GRKK]. For example, Minnesota has a presumption that PTSD is a personal injury that was caused by the first responder's job. Minn. Stat. § 176.011, subd. 15(e) ("If, preceding the date of disablement or death, an employee who was employed on active duty as: [a first responder] . . . is diagnosed with [PTSD] . . . , and had not been diagnosed with the mental impairment previously, then the mental impairment is presumptively an occupational disease and shall be presumed to have been due to the nature of employment."); *id.* at § 176.66, subd. 1 ("The disablement of an employee resulting from an occupational disease shall be regarded as a personal injury within the meaning of the workers' compensation law."). However, that presumption can be rebutted by "substantial factors brought by the employer or insurer." *Id.* at § 176.011, subd. 15(e).

Some states do not have a presumption that PTSD was caused by the first responder's job. Texas allows first responders to recover for PTSD as a compensable injury if it is "caused by one or more events occurring in the course and scope of the first responder's employment" and "the preponderance of the evidence indicates that the event or events were a producing cause of the disorder." Tex. Lab. Code Ann. § 504.019(b). In Washington, "claims [that are] based on mental conditions or mental disabilities caused by stress" are not an occupational disease. Wash. Rev. Code § 51.08.142(1). However, a specific exclusion is set aside for first responders, including public safety telecommunicators, who may bring occupational disease claims resulting from PTSD. *Id.* § 51.08.142(2)(a), (d). Florida's and Nevada's statutes specifically delineate certain triggering events that allow for compensation for a PTSD diagnosis among first responders. Fla. Stat. § 112.1815(5)(a)(2)(a–k) (providing a list of triggering incidents); Nev. Rev. Stat. § 616C.180(4)(a–b) (allowing a first responder to recover for stress if the employee witnessed "the death, or the aftermath of the death, of a person as a result of a violent event" or "an injury, or the aftermath of an injury, that involves grievous bodily harm of a nature that shocks the conscience" if it was during the scope of employment"). Notably, Florida's statute contains several triggering incidents related to the death of minors. Fla. Stat. § 112.1815(5)(a)(2)(a–e).

Ohio has gone even further by creating a state post-traumatic trust fund for its first responders outside of the worker's compensation scheme. *See* Ohio Rev. Code Ann. § 126.65. This fund allows first responders diagnosed with PTSD

to receive lost wages and medical bills if PTSD was during the "course of, and arising out of, employment as a public safety officer but without an accompanying physical injury." *Id.* § 126.65(B).

To me, Minnesota's rebuttable-presumption framework provides more comprehensive protection to our first responders who are more likely to face traumatic events while exhaustively serving our communities and enforcing our laws. Alternatively, the legislature can look at the other mentioned legislative statutes, and unmentioned ones, to further address the problem of PTSD among first responders.

#21–0841, *Tripp v. Scott Emergency Commc'n Ctr.*

**WATERMAN, Justice (dissenting).**

I respectfully dissent. I would apply our longstanding precedent to affirm the district court judgment that upheld the workers' compensation commissioner's fact-bound determination denying Mandy Tripp's mental injury claim. The majority overrules our caselaw that required employees claiming purely mental injuries to show that the triggering event was sudden, traumatic, and unexpected *in their occupation.* Substantial evidence supported the commissioner's factual determination that Tripp's phone call with the hysterical mother was not an unexpected event for an emergency dispatcher, as other witnesses testified. We are required to affirm the agency's determination under our deferential standard of review. The majority's ill-advised change to the legal causation element in mental injury claims opens the floodgates to fraudulent claims that are difficult to disprove and will drive up the cost of doing business in Iowa.

**I. The Commissioner's Decision Should Be Affirmed Under Controlling Law.**

In *Dunlavey v. Economy Fire & Casualty Co.,*

> we adopt[ed] an objective standard of legal causation for purely mental injury claims and place[d] the burden on the employee to establish that the mental injury was caused by workplace stress of greater magnitude than the day-to-day mental stresses experienced by other workers employed *in the same or similar jobs*, regardless of their employer.

526 N.W.2d 845, 858 (Iowa 1995) (emphasis added). The majority misreads *Brown v. Quik Trip Co.* as abandoning that "same or similar job" requirement;

*Brown* did no such thing. *See* 641 N.W.2d 725, 728 (Iowa 2002). To the contrary, *Brown* described its single-trauma test as "consistent with *Dunlavey.*" *Id.* Normally, when we abandon a proof requirement, we say so explicitly.

Shortly after we decided *Dunlavey*, we extended it to cover accidental disability claims by police officers claiming purely mental injuries from specific traumatic incidents in *Moon v. Board of Trustees of the Municipal Fire & Police Retirement System of Iowa*, 548 N.W.2d 565, 568 (Iowa 1996). There, a police officer suffered from a panic disorder with agoraphobia and sought "accidental disability benefits from the Municipal Fire and Police Retirement System of Iowa" codified in Chapter 411. *Id.* at 567.

> Moon allege[d] that his disability was caused by two incidents that took place while on duty. In 1980, as a member of an intelligence unit, Moon confronted a man suspected of armed robbery. The suspect attempted to escape, but Moon did not shoot at him because he was afraid his partner would be caught in the crossfire. He soon began having nightmares about the incident. In 1985 a young officer who served under Moon committed suicide, and Moon was called to the scene. Shortly before the suicide, Moon had disciplined the officer, and Moon stated that he felt guilty for not having identified the officer's problems.

*Id.* Moon had testified that the incidents were not typical for police officers but admitted that police work "can become very dangerous, in a split second" and "[t]here's a lot of stress associated with the job." *Id.* at 569. Another officer testified that "police work is more stressful on a day-to-day basis than the average occupation," and the chief of police testified that he did not consider the two incidents "exceptionally stressful" for police officers. *Id.* at 569–70. On our review, we reiterated that the *Dunlavey* standard is occupation-focused and, in this context, required "the stress be 'of greater magnitude than the day-to-day

mental stress experienced by other [police] officers.' " *Id.* at 569 (alteration in original) (quoting *Dunlavey*, 526 N.W.2d at 857). We concluded that "[t]here [wa]s substantial evidence in the record to support the board's conclusion that the two incidents that allegedly caused Moon's disability were no more than the day-to-day stresses commonly associated with police departments." *Id.* at 569.

Whether the occupation-specific legal causation standard is met in a particular case is a question of fact that must be affirmed on appeal when that determination is supported by substantial evidence—notwithstanding whether benefits were denied or awarded. Two years after *Moon*, we affirmed the board's award of mental disability benefits to a police officer who "witness[ed] a person burning to death" and "confront[ed] an armed person alone." *City of Cedar Rapids v. Bd. of Trs. of the Mun. Fire & Police Ret. Sys. of Iowa*, 572 N.W.2d 919, 925–26 (Iowa 1998). Applying our deferential standard of review, we affirmed, stating, "Based on testimony from [the police captain and the operations chief], the board could have found against [officer] Cornish on the legal causation issue. That fact, however, does not mean there was insubstantial evidence to support the ruling the board made." *Id.* As this case shows, benefits for purely mental injuries triggered by specific traumatic incidents have been available to first responders under *Dunlavey*'s occupation-specific standard in Iowa for several decades.

Indeed, the Iowa Workers' Compensation Commissioner has repeatedly awarded first responders and corrections personnel workers' compensation benefits for purely mental injuries, applying the occupation-focused standard.

*See Christensen v. Pottawattamie County*, Iowa Workers' Comp. Comm'n No. 5051440, 2017 WL 1161144, at *7 (Dec. Mar. 23, 2017) (Grell, Arb.) (finding legal causation based on unexpected, gruesome nature of inmate's suicide attempt); *Schuchmann v. Dep't of Transp.*, Iowa Workers' Comp. Comm'n No. 5035676, 2012 WL 2371481, at *7 (Dec. June 20, 2012) (Hedberg, Arb.) (finding legal causation when a department of transportation vehicle enforcement officer viewed charred human remains at highway accident scene); *Everhart v. Clarinda Corr. Facility*, Iowa Workers' Comp. Comm'n No. 5007651, 2005 WL 2465835, at *3 (Dec. Sept. 30, 2005) (Trier, App.) (finding legal causation when a prison guard was hit with bodily fluids and feared he contracted HIV).

These determinations on purely mental injury claims are made by the agency case by case, subject to our deferential standard of review. We are bound by the commissioner's findings of fact that are supported by substantial evidence. *Asmus v. Waterloo Cmty. Sch. Dist.*, 722 N.W.2d 653, 657 (Iowa 2006). And we are bound by the commissioner's application of law to the facts unless it is "irrational, illogical, or wholly unjustifiable." *Brewer-Strong v. HNI Corp.*, 913 N.W.2d 235, 242 (Iowa 2018) (quoting *Westling v. Hormel Foods Corp.*, 810 N.W.2d 247, 251 (Iowa 2012)); Iowa Code § 17A.19(10)(*m*) (2019). Applying these standards, I find no reversible error in the agency's determinations.

Tripp had the burden "to show by a preponderance of the evidence that the injury arose out of and in the course of [her] employment." *Dunlavey*, 526 N.W.2d at 849. To do so, she had to prove both medical and legal causation.

*Asmus*, 722 N.W.2d at 657; *Brown*, 641 N.W.2d at 727; *Dunlavey*, 526 N.W.2d at 853. For medical causation, "[w]hether an injury has a direct causal connection with the employment or arose independently thereof is essentially within the domain of expert testimony." *Dunlavey*, 526 N.W.2d at 853. "Legal causation, on the other hand, presents a question of whether the policy of the law will extend responsibility to those consequences that have in fact been produced by the employment." *Asmus*, 722 N.W.2d at 657. The Scott County Emergency Communications Center (SECC) and its insurer conceded Tripp established medical causation. The fighting issue in this case was legal causation, a question of fact on this record.

The majority's discussion of the record is incomplete. Tripp testified she had taken three infant death calls before the September 30, 2018 phone call at issue. She admitted that she "never know[s] what's on the other end of the phone." Specifically, she testified:

> [DEFENSE COUNSEL:] Now, throughout your training, throughout your experience it is typical to deal with people who are distraught; is that fair to say?
>
> [TRIPP:] That's fair.
>
> [DEFENSE COUNSEL:] Yeah.
>
> Because in cases of emergency, who are people to call?
>
> [TRIPP:] Me.
>
> [DEFENSE COUNSEL:] That's right.
>
> That's your job, correct?
>
> [TRIPP:] Correct.

[DEFENSE COUNSEL:] And you never know what's coming your way, do you?

[TRIPP:] I do not.

Tripp admitted that handling 911 calls where the caller is crying, almost incoherently, is potentially an everyday occurrence for a 911 operator.

A 911 dispatcher for MEDIC Ambulance, Jill Cawiezell, who took over the September 30 phone call after Tripp transferred it, testified that she handles distraught callers daily. She has over twenty-four years of experience and has personally handled twelve infant death calls. She testified that infant death calls are not unusual or sudden and that death, distraught callers, and trauma are common in her job. Denise Pavlik, the former director of the SECC, testified that she heard the September 30 phone call and did not consider that call to be unusual, sudden, or unexpected. She explained that over ten people were involved with that call. Pavlik has answered fifteen calls throughout her career where children had died, including three calls where the caller has said "my baby is dead." She testified that life-and-death calls are an everyday occurrence for 911 operators. Tracey Sanders, the current deputy director of the SECC, with over twelve years of experience as a dispatcher, also testified. She, too, reviewed the September 30 phone call and opined that it was not unusual, unexpected, or sudden for their occupation. She testified that the average 911 dispatcher takes twenty calls a day and Tripp was no exception.

The deputy commissioner entered an Arbitration Decision that determined Tripp was unable to meet the legal causation requirement:

> Legal causation involves a determination of whether the work stresses and tensions the employee experienced, when viewed objectively and not as the employee perceived them, were of greater magnitude than the day to day mental stresses workers employed in the same or similar jobs experience routinely regardless of their employer.

The deputy commissioner found that "there [was] considerable evidence in the record that [911] dispatchers, like [Tripp], routinely take calls involving death and traumatic injury" and that "taking a call regarding a dying or dead infant cannot be said to be an unexpected cause or an unusual strain."

Tripp filed a motion for rehearing urging the deputy commissioner to expressly find that Tripp "suffers from PTSD and that she proved medical causation" and to reverse the decision on legal causation because Tripp satisfied the requirements of *Brown*. Alternatively, Tripp requested *Brown* be overruled. The SECC and its insurer resisted. The deputy commissioner denied Tripp's motion, confirming his finding that Tripp had not demonstrated legal causation because the September 30 phone call was not unexpected "given the nature of the [911] dispatcher's job." Tripp filed an intra-agency appeal.

After additional briefing by the parties, the workers' compensation commissioner entered an appeal decision. On de novo review, the commissioner affirmed and adopted the deputy's decision on Tripp's rehearing request as the agency's final decision. The commissioner elaborated:

> [T]he question of what qualifies as an unexpected cause or an unusual strain is specific to the individual and must be addressed on a case-by-case basis. What can be expected by an individual in the workplace, is, in part, dependent upon their occupation. It stands to reason that an individual's occupation would be a factor to consider.

Tripp filed a petition for judicial review. On June 11, 2021, after further briefing and oral argument, the district court affirmed the commissioner's decision. The court declined to defer to medical experts offering nonmedical conclusions about working conditions. The district court ruled the commissioner properly considered the job responsibilities of emergency dispatchers in applying the *Brown* test:

> In determining whether a particular event is unexpected or unusual, the Commissioner must first establish a baseline of what is expected or usual. As every individual's day-to-day life is unique, this baseline seems to be most appropriately drawn by looking to the unique features of each particular claimant's experiences—including their ordinary workplace activities. Accordingly, the Court finds that it was not error for the Commissioner to consider the regular job responsibilities of [Tripp] in evaluating whether her harm was the result of an unexpected cause or unusual strain.

The district court determined the agency decision was supported by substantial evidence because life-and-death emergency calls are relatively common for 911 operators. On this record, the district court correctly affirmed the commissioner's denial of mental disability benefits to Tripp. We should affirm.

**II. The Majority's Decision to Overrule Longstanding Caselaw is Contrary to Principles of Stare Decisis and Not Well Reasoned.**

I respectfully dissent from the majority's decision to overrule our longstanding precedents. Stare decisis considerations counsel against the majority's radical break with existing law. Further, our prior decisions were well reasoned and correctly decided, and the majority's justification for overruling these precedents is wanting.

"Stare decisis alone dictates continued adherence to our precedent absent a compelling reason to change the law." *Book v. Doublestar Dongfeng Tyre Co.*,

860 N.W.2d 576, 594 (Iowa 2015). Ever since we decided *Dunlavey*, *Moon*, and *Brown* decades ago, the commissioner has consistently applied an occupation-specific test to determine whether the triggering event is sudden, traumatic, and unexpected for workers in the same or similar jobs. The legislature, which has quickly amended chapter 85 when it disagrees with our interpretation,[4] has left *Moon*, *Brown*, and *Dunlavey* intact and declined to relax the proof required for purely mental injuries under Iowa Code chapters 85 and 411. "The rule of stare decisis 'is especially applicable where the construction placed on a statute by previous decisions has been long acquiesced in by the legislature, by its continued use or failure to change the language of the statute so construed . . . .' " *Brewer-Strong*, 913 N.W.2d at 249 (omission in original) (quoting *In re Est. of Vajgrt*, 801 N.W.2d 570, 574 (Iowa 2011)). Presumably, the legislature was unwilling to open the floodgates to mental injury claims as they are difficult to disprove and increase insurance costs while inhibiting job creation.

The majority's rationale for breaking with our longstanding law is not well-supported. First, the majority's new holding today begs the question: "unexpected" *compared to what*? As the district court noted, "the Commissioner must first establish a baseline of what is expected or usual" by looking to the claimant's occupation. What is expected or unexpected necessarily varies by

---

[4]*See, e.g.*, *Bluml v. Dee Jay's, Inc.*, 920 N.W.2d 82, 90–92 (Iowa 2018) (allowing recovery for idiopathic fall on level floor), *abrogated* by 2019 Iowa Acts 38, § 1 (codified at Iowa Code § 85.61(7)(*c*) (2020)) (modifying definition of "personal injury arising out of employment" to exclude "[p]ersonal injuries due to idiopathic or unexplained falls from a level surface onto the same level surface").

occupation. Witnessing a death on the job would be unexpected for most occupations; not so for a hospice nurse. A threatening tiger is routine for Siegfried and Roy; not so for the Las Vegas ticket taker outside the cage. Police, firefighters, and medics routinely face life-threatening emergencies as part of the job; other occupations, such as the convenience store clerk in *Brown,* do not. Telemarketers and 911 operators should not be equated when determining whether a particular phone call is traumatic or unexpected.

Second, the majority and special concurrence rely on a flawed premise: that first responders can't recover for their purely mental injuries under *Dunlavey* because stressful emergencies are part of the job. The majority wants an easier path for mental disability benefits for emergency workers, including 911 operators who are not physically present at the crime or accident scene. To me, that is a policy determination for the legislature, which for decades has left the *Dunlavey* same-or-similar-job proof requirement intact. And as noted above, agency fact finders applying *Dunlavey* have repeatedly allowed first responders to recover for purely mental injuries triggered by specific events. The bar is not set too high.

Third, the majority reads *Brown* in a vacuum in a manner inconsistent with the larger body of law in this area. When *Brown* is read together with *Dunlavey* and *Moon,* it is clear we did not abandon the same-or-similar-job requirement for traumatic events. In *Dunlavey,* we "establish[ed] a standard for legal causation" for "a worker's pure nontraumatic mental injury." 526 N.W.2d at 854. We reviewed three options: a "subjective causal nexus" test, a "broad

causation" test, and an "unusual stress" test. *Id.* at 855. The "subjective test focuses on the employee's own perception of reality in that if the claimant honestly perceives that there is some work related stimuli causing a mental disability the employee is entitled to recover." *Id.* This test was adopted by Michigan and later repudiated by statute. *Id.*; *see also* Mich. Comp. Laws § 418.301(2) (1985). "The 'broad causation' test allows a worker to be compensated for normal work related stress as long as the worker's mental injury is causally connected to the employment." *Dunlavey*, 526 N.W.2d at 855. "This approach is premised on the view that the basic purpose of a workers' compensation system mandates that a worker disabled as a result of work related stress receive treatment identical to a worker disabled by a work related physical injury." *Id.* (quoting *Candelaria v. Gen. Elec. Co.*, 730 P.2d 470, 477 (N.M. Ct. App. 1986), *superseded by statute as stated in Jensen v. N.M. State Police*, 788 P.2d 382, 384 (N.M. Ct. App. 1990)). We declined to adopt either the subjective-causal-nexus test or broad-causation test because neither "correspond[s] to our statutory goal of making sure the mental injuries are causally connected to the worker's employment." *Id.* at 856.

We instead adopted an occupation-specific unusual-stress test for nontraumatic mental injuries. *Id.* at 858. The test "requires the employee to show that the work stress which led to the [mental] injury was unusual." *Id.* at 855. The unusual-stress test was "developed . . . as a response to the difficulties in the evaluation of psychological injuries, such as the ease with which such claims may be feigned and the difficulty with which fraudulent claims can be detected."

*Id.* The unusual-stress requirement helps ensure that "mental injuries are causally connected to the worker's employment" and "furthers the intent of the legislature to compensate those workers who suffer bona fide 'personal injuries' caused by their employment." *Id.* at 856.

The unusual-stress test reflects that the workers' compensation system provides a remedy for industrial accidents and is not a general mental health insurance system. *See id.* at 856. We chose the unusual-stress test mindful of the " 'slippery slope' argument that once 'mental[-]mental' claims are deemed compensable, employees will increasingly make fraudulent claims which the courts will not be able to detect and which will ultimately force employers out of business." *Id.* Because the test "places the burden on the employee to prove that the work stress suffered is unusual, [it] is an effective means of evaluating employees' claims." *Id.*

We deliberately chose to adopt Wyoming's occupation-specific standard for our unusual-stress test in *Dunlavey* instead of Wisconsin's broader standard that merely required proof of stress "greater than that endured by all other workers" in any field. *Id.* at 855–57. We concluded that the Wyoming standard is preferable because it "provides the employees with compensation for legitimate work related injuries while at the same time limits the employers' liability to injuries caused by its industry"[5] and avoids the confusion of what is meant by

---

[5]It might be considered modern and forward looking for worker's compensation to be expanded to provide full coverage health insurance. But that was not its intended purpose, and it would be unfair to the employer who pays premiums on the assumption that they cover only injuries caused by [its] industry.

"all workers."[6] *Id.* at 857. We approvingly quoted the Wyoming Supreme Court's explanation of the benefits of the occupation-specific-unusual-stress test:

> Unlike the "fellow employees" test, this test could be used in cases where the worker has no fellow employee holding the same job in his company. Moreover, under the same or similar job standard, an employer who puts excessive stress on several employees could not avoid the payment of benefits by simply making that excessive stress equal for all employees. The stress on [its] workers would be compared to the stress suffered by those holding similar jobs in other companies.
>
> . . . .
>
> The objective test based on workers with the same or similar jobs is also superior to a test based on the working world at large. It is impossible to determine, except in the broadest fashion, the stress to which the working world at large is exposed. In every worker's compensation case heard under this test, the parties could call witnesses whose job related stress is either significantly greater or significantly smaller than the stress suffered by the worker seeking compensation. The standard would be too amorphous to be practical.

*Dunlavey*, 526 N.W.2d at 857–58 (alteration and omission in original) (quoting *Graves v. Utah Power & Light Co.*, 713 P.2d 187, 193 (Wyo. 1986), *superseded by statute as stated in Sechrist v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 23 P.3d 1138 (Wyo. 2001)). We found these justifications persuasive. *Id.* at 858. We also noted states were increasingly enacting statutes requiring proof

---

*Graves v. Utah Power & Light Co.*, 713 P.2d 187, 190 (Wyo. 1986), *superseded by statute as stated in Sechrist v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 23 P.3d 1138 (Wyo. 2001).

[6]The objective "all employees" standard could be based upon three different groups. First, "all employees" could consist of a worker's "fellow employees" employed in the same or similar jobs by the same employer. Second, it could consist of workers in the same or similar jobs, including those who work for other employers. Finally, it could consist of the "working world at large."

*Graves*, 713 P.2d at 192.

comparing the claimant's stress to those in similar jobs rather than workers generally:

> [T]hose states which have had experience with "mental[-]mental" claims are increasingly enacting statutes which require proof that the employee's stress is greater than that of similarly situated employees. *See, e.g.,* Alaska Stat. § 23.30.265(17)(A) (1990) (work stress must be "extraordinary and unusual in comparison to pressures and tensions experienced by individuals in a comparable work environment"); Colo. Rev. Stat. Ann. § 8–41–301(2)(a)–(d) (West Supp. 1994) (the psychologically traumatic event must be "generally outside of a worker's usual experience and would evoke significant symptoms of distress in a worker in similar circumstances"); N.M. Stat. Ann. § 52–1–24(A) (Michie 1978 & Supp.1994) (same).

*Id.*

In *Brown,* we addressed mental injuries attributed to a store clerk's specific on-the-job traumatic events. 641 N.W.2d at 727–28. Brown was far from a professional first responder. He was working alone at night in his employer's convenience store and witnessed a customer inside get shot in the leg. *Id.* at 726. Brown was not physically injured, but he had to clean up the blood from the shooting. *Id.* Six days later, he was working alone again and was the victim of a robbery. *Id.*

> The robber grabbed Brown by the arm, swung him around, stuck an object that Brown thought to be a gun in Brown's back, and demanded all of the money, which Brown gave to him. Brown was told to get down, and he did. The robber left but returned and said, "I told you to get the . . . down or I'm going to blow your . . . head off." Brown laid spread-eagle on the floor until the phone rang; it was the security organization calling in response to a silent alarm that Brown had triggered.

*Id.* (omissions in original). Brown was diagnosed with delayed PTSD and his doctor opined that "the additional trauma of the robbery aggravated the effect of the shooting, so the cumulative effect was more traumatic than the sum of the

two events." *Id.* at 726–27. The deputy commissioner found Brown had established both medical and legal causation, but the commissioner reversed, finding Brown failed to establish legal causation because "he had not shown his stress was greater than that of other workers employed in the same or similar jobs." *Id.* at 727–28. "Quik Trip contended this was fatal to his claim, and the industrial commissioner and district court agreed." *Id.* at 728.

We reversed, concluding that "[w]hen a claim is based on a manifest happening of a sudden traumatic nature from an unexpected cause or unusual strain, the legal-causation test is met irrespective of the absence of similar stress on other employees." *Id.* at 729. Our colleagues in the majority misread this statement as eliminating *Dunlavey*'s requirement to compare the claimant's stress to others in the same or similar jobs. To the contrary, we stated that "[t]his conclusion is consistent with *Dunlavey*, which did not involve a readily identifiable stress factor such as in this case." *Id.* at 728. We were addressing a failure of proof claim and concluded, from the very nature of the two incidents, that the evidence was sufficient to establish the *store clerk's* mental injury claim, without testimony of other witnesses, to prove that an Iowa convenience store employee in Iowa did not routinely experience shootings and armed robberies.

The majority effectively overrules *Moon*, where we had confirmed that the compensability of a first responder's mental injury triggered by one or two specific incidents is determined under *Dunlavey* by reference to the claimant's occupation as a police officer. *Moon*, 548 N.W.2d at 569–70. In my view, *Moon*

and *Dunlavey* remained good law for first responders. This is confirmed by a careful reading of *Brown* and the authorities cited in that opinion.

In *Brown*, we again relied on Wyoming precedent and agreed that:

> Where a mental injury occurs rapidly and can be readily traced to a specific event, . . . there is a sufficient badge of reliability to assuage the Court's apprehension. Where, however, a mental injury develops gradually and is linked to no particular incident, the risk of groundless claims looms large indeed.

*Id.* at 728 (omission in original) (quoting *Graves*, 713 P.2d at 192). Noting both *Graves* and *Dunlavey* involved nontraumatic-gradual-onset mental injuries, we went on to discuss another Wyoming case more directly on point as involving a mental injury from an on-the-job accident. *Id.* at 728–29 (citing *Johnson v. State ex rel. Wyo. Worker's Comp. Div.*, 798 P.2d 323, 326 (Wyo. 1990)).

In *Johnson v. State ex rel. Wyoming Worker's Compensation Division*, the employee was an over-the-road truck driver involved in two accidents. 798 P.2d at 324. In the first accident, "Johnson had bruised his back but did not seek medical treatment." *Id.* In the second, "As [Johnson] rounded a curve, the wind hit the truck and spun it around 180 degrees. The truck came close to colliding with another vehicle but missed. The highway patrol stated the road should have been closed at the time the accident occurred." *Id.* "The psychiatrist determined that Johnson was suffering from depression and [PTSD]" as a result of the second accident. *Id.* The Wyoming Supreme Court held Johnson satisfied the legal causation requirement without presenting evidence of similarly situated employees. *Id.* at 325–36.

In *Brown*, after discussing the facts and holding of *Johnson*, we approvingly quoted this passage applying a same or similar job test:

> The accident also satisfies the requirement that the mental injury resulted from a situation or condition that is of greater magnitude than the day-to-day stresses and tensions all employees usually experience. *While it may be normal for and expected of over-the-road truck drivers to encounter hazardous, wintery driving conditions on Wyoming highways, involvement in an accident when driving in those conditions or any weather conditions falls beyond any day-to-day stress and tensions.* It was the accident and not the driving in hazardous conditions that caused Johnson's injuries.

*Brown*, 641 N.W.2d at 728–29 (emphasis added) (quoting *Johnson*, 798 P.2d at 326).[7] Importantly, the focus of this test is on what is "normal for and expected of" the claimant's occupation—such as over-the-road truck driving in *Johnson*. We endorsed that approach. *Id.* at 729. Thus, we held the shooting and robbery satisfied the legal causation requirement because "[t]hese events were sudden, traumatic, and unexpected" and "Quik Trip, in fact, d[id] not contend otherwise." *Id.* Given the nature of the traumatic incidents in *Brown* and *Johnson*, the workers' compensation claims were reinstated despite the claimant's failure to introduce baseline evidence of the stress of other workers in the same or similar jobs.

Other states take different approaches. Some states allow no relief under any circumstances for purely mental injury claims. *See* 4 Arthur Larson et al.,

---

[7]After we decided *Brown*, the Wyoming legislature amended its workers' compensation statutory definition of "injury" to exclude compensation for mental injury unless it is "[c]aused by a compensable physical injury, it occurs subsequent to or simultaneously with, the physical injury and it is established by clear and convincing evidence." Wyo. Stat. Ann. § 27-14-102(a)(xi)(J) (West 2009). This reflects a subsequent policy choice by the Wyoming legislature.

*Larson's Workers' Compensation Law* § 56.06[1][b], at 56-50, & 56.06[4], at 56-55 (2021) [hereinafter Larson] ("[F]ifteen states and the [federal] Jones Act have expressly ruled out liability in any kind of mental-mental case." (footnotes omitted)). Iowa was in the middle in allowing recovery in a mental-mental case where an unusual stress triggered the mental injury. *See id.* § 56.06[6], at 56-57. There is also a lack of uniformity on what is considered "unusual." This noted commentator observed:

> To summarize: there can thus be identified four answers to the question: "unusual compared with that?" These are:
>
> (1) Unusual compared with *this employee's* normal strains.
>
> (2) Unusual compared with other, *similarly situated* employees' strains in the normal work environment.
>
> (3) Unusual compared with the strains of *employment life generally*.
>
> (4) Unusual compared with the wear and tear of *everyday nonemployment life*.
>
> Unfortunately, most opinions in this area—and statutes as well—only use the word "unusual" without specifying which of these comparisons is intended.

3 Larson, § 44.05[4][d], at 44-43 (footnotes omitted). Until today, Iowa fit in this treatise's second category, comparing the claimant's stress with workers "in the same or similar jobs." *Dunlavey*, 526 N.W.2d at 858.

I am not persuaded by cases from jurisdictions that use a more lenient test for legal causation such as *Diaz v. Illinois Workers' Compensation Commission,* 989 N.E.2d 233, 240 (Ill. App. Ct. 2013) (determining whether stress of police officer threatened with a gun exceeded "that of the general

public"). Comparing the claimant to the "working world at large" is an approach we rejected as "too amorphous to be practical." *Dunlavey*, 526 N.W.2d at 857–58 ("In every worker's compensation case heard under this test, the parties could call witnesses whose job related stress is either significantly greater or significantly smaller than the stress suffered by the worker seeking compensation." (quoting *Graves*, 713 P.2d at 193)). The proper comparison is to workers in the same or similar jobs. *Id. Diaz* is directly contrary to our decision in *Moon*, where we emphasized that *Dunlavey*'s legal causation test is to be applied with reference to the claimant's occupation as a police officer—not workers in general. *Moon*, 548 N.W.2d at 569.[8]

Arizona recently adopted an approach similar to *Dunlavey* in *France v. Industrial Commission of Arizona*, 481 P.3d 1162 (Ariz. 2021). In *France*, two deputy sheriffs were dispatched to perform a welfare check for a man threatening to kill himself with a shotgun. *Id.* at 1163. The man advanced toward Deputy Sheriff France and "point[ed] a shotgun two to three feet away from [France's] chest and face." *Id.* at 1164. The deputies shot the man several times and

---

[8]The majority relies on *Sparks v. Tulane Medical Center Hospital & Clinic*, 546 So. 2d 138 (La. 1989), but that case did not involve a first responder or a single traumatic incident. Rather, that court allowed recovery for a hospital "exchange card supervisor's" mental injury triggered by a series of death threats, vandalism, and harassment by her fellow employees spanning years. *Id.* at 140–41. The *Sparks* court recognized purely mental injury claims for the first time in that state, over the dissent of three justices. *Id.* at 148–49; *id.* at 149 (Marcus, J., dissenting) ("I do not consider . . . plaintiff's work-related stress to be an 'injury' " under Louisiana's Worker's Compensation Act); *id.* (Hall, J., dissenting) (concluding that the statute did not allow recovery for "mental-mental" injuries and stating, "Any change should come from the legislature and not the court. Even under the new interpretation of the law enunciated in the majority opinion, I would hold that this plaintiff is not entitled to benefits because her mental condition, as real and as unfortunate as it is, was not precipitated by an accident, i.e., an unexpected and unforeseen event that occurred suddenly or violently. It was the result of several years of work-related stress"). I agree with Justice Hall's dissent in *Sparks* that it is the legislature's role to expand recovery for purely mental injuries, not the court's.

watched him die. *Id.* France developed PTSD and sought workers' compensation benefits, which were denied. *Id.* For mental injuries from a single work-related event, the Supreme Court of Arizona interpreted "the central inquiry" of its workers' compensation statute as "whether the work-related event *itself* imposed stress on the employee that was 'unexpected, unusual or extraordinary.' " *Id.* at 1167 (quoting Ariz. Rev. Stat. Ann. § 23-1043.01(B) (2017)). The court further explained that

> not all mental injuries caused by violent encounters experienced by law enforcement officers in the line of duty are compensable. As a preliminary matter, an officer must first establish that his work-related stress was a substantial contributing cause of his mental injury. Unlike the present case, many claims may not satisfy this initial hurdle. *Additionally, a court must examine the stressfulness of any such incident from the standpoint of a "reasonable person" with the same or similar job duties as the claimant, e.g., another law enforcement officer.* Thus, applying this standard, officers may be involved in many encounters in the line of duty that produce expected, common, and ordinary stress.

*Id.* (emphasis added) (vacating agency ruling that denied benefits under wrong legal standard).

New York courts previously took the position our court adopts today, determining whether mental injures were compensable by looking at the "emotional strain or tension . . . to which all workers are occasionally subjected." *Wilson v. Tippetts-Abbott-McCarthy-Stratton*, 253 N.Y.S.2d 149, 150 (App. Div. 1964). New York courts then saw the light and now require claimants to "demonstrate that the stress that caused the claimed mental injury was greater than that which other *similarly situated workers* experienced in the normal work environment." *Casey v. United Refin. Comp. of Pa.*, 149 N.Y.S.3d 309, 311

(App. Div. 2021) (emphasis added). Whether stress is unusual is based on the complainant's occupation. *See, e.g.*, *Rivenburg v. County of Albany*, 131 N.Y.S.3d 431, 432–33 (App. Div. 2020) (affirming a denial workers' compensation benefits to a correctional officer personally threatened by a colleague and whose family was threatened by an inmate because "[g]iven the nature of the work required of correction officers and the character of the individuals under confinement, the stress created by dealing with the inmates was no different for claimant than it was for other correction officers").

Missouri courts likewise apply an objective standard to compare "the claimant's level of stress with the level of stress faced by other employees in the same profession." *Mantia v. Mo. Dep't of Transp.*, 529 S.W.3d 804, 810 (Mo. 2017) (en banc) (reversing an award of benefits because claimant failed "to present evidence the actual work events comprising the 'same or similar conditions' would have caused extraordinary and unusual stress to a reasonable highway worker").[9] The Iowa legislature can decide whether to restore the occupation-specific test for mental disability claims in our state.

---

[9]Missouri's Workers' Compensation Act includes a special provision exempting firefighters from the requirement to prove work-related stress was objectively "extraordinary and unusual." *Mantia*, 529 S.W.3d 810–11 & 811 n.2 (citing Mo. Rev. Stat. § 287.120.10 (2005)). This exception presumably was enacted "because the legislature believed stress is such a regular matter for firefighters that it would be difficult to show that stress was of an 'extraordinary and unusual' degree for those in that occupation." *Byous v. Mo. Loc. Gov't Emps. Ret. Sys. Bd. of Trs.*, 157 S.W.3d 740, 756 n.1 (Mo. Ct. App. 2005) (Smart, J., concurring in part and dissenting in part). The Iowa legislature has not enacted a similar provision in Iowa Code chapter 85 or chapter 411, and I wouldn't create one in the guise of interpretation. The legislature is the proper audience for Tripp's request for a change in the law to relax proof requirements for work-related PTSD or other mental injuries suffered by emergency dispatchers or first responders.

**III. Conclusion.**

For these reasons, I would affirm the district court judgment upholding the agency ruling denying Tripp's mental injury claim based on its factual determination that the stress of her phone call was not unusual or unexpected for an emergency dispatcher.

Mansfield and McDonald, JJ., join this dissent.